MARSHALL EMERSON WOODRUFF *v.*
STATE OF MARYLAND

[No. 42, September Term, 1970.]

*Decided February 9, 1971.*

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, THOMPSON, MOYLAN, and POWERS, JJ.

*Charles A. Dukes, Jr.*, for appellant.

*Alfred J. O'Ferrall, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, John J. Garrity, Assistant Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Jayson L. Amster, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MOYLAN, J., delivered the majority opinion of the Court. ANDERSON, ORTH, and POWERS, JJ., dissent. Dissenting opinion by ORTH, J., in which ANDERSON and POWERS, JJ., concur, at page 230 *infra.*

The appellant, Marshall Emerson Woodruff, was the twenty-five-year-old owner and operator of a small store, called The Joint Possession, in College Park, Maryland, which specialized in selling leather goods, posters and other objects of interest primarily to young people, including several varieties of underground newspapers. On June 23, 1969, a Prince George's County policeman purchased from a sales person in the store, not the appellant, a copy of *The Washington Free Press,* Volume 3, No. 5, dated June 1-15. The appellant was subsequently indicted for a violation of Article 27, Section 418, in that he did, in the words of the indictment, "unlawfully and knowingly sell and have in his possession with the intent to sell lewd, obscene and indecent newspapers." At a non-jury trial in the Circuit Court for Prince George's County, the appellant was convicted and was subsequently sentenced to a term of six months in jail and to a fine of $1,000. On appeal he raises essentially three issues:

(1) That the newspaper in question was not obscene,

(2) That the trial court committed prejudicial error in excluding from evidence testimony offered by him on the question of obscenity, and

(3) That there was no showing by the State of scienter on his part.

Initially, it is clear that the words "lewd" and "inde-

cent", contained in the indictment, have been absorbed into the word "obscene" and have no independent vitality of their own. *Donnenberg v. State,* 1 Md. App. 591, 597; *Levin v. State,* 1 Md. App. 139, 143.[1] It is also clear that the courts, trial and appellate, of this State are bound by the definition of obscenity as enunciated by the Supreme Court of the United States and that the Maryland Legislature intended by its use of the word "obscene" to connote that which the word "obscene" means in prevailing leading legal thought. *Donnenberg v. State, supra,* at 597, and *Levin v. State, supra,* at 143. That a state legislature's or state court's definition of "obscene" may not be broader than that constitutionally permitted by the First and Fourteenth Amendments was made clear in *Mishkin v. New York,* 383 U. S. 502, 507-508:

> "States are free to adopt other definitions of obscenity only to the extent that those adopted stay within the bounds set by the constitutional criteria of the *Roth* definition, which restrict the regulation of the publication and sale of books to that traditionally and universally tolerated in our society."

### Necessity for Independent Review

It has been uniformly recognized by this Court, the Court of Appeals and the United States Supreme Court that the reviewing court has the obligation to make an independent, reflective constitutional judgment on the facts. *Jacobellis v. Ohio,* 378 U. S. 184; *Wagonheim v. Maryland State Board of Censors,* 255 Md. 297; *Sanza v. Maryland State Board of Censors,* 245 Md. 319; *Levin v. State, supra; Donnenberg v. State, supra; Lancaster v. State,* 7 Md. App. 602; *Dillingham v. State,* 9 Md. App. 669, 673.

---

1. Indeed, when Chapter 394 of the Acts of 1967 amended Article 27, Section 418, it dropped completely the adjectives "lewd" and "indecent", which by then had degenerated into merely superfluous synonyms for the critical word "obscene."

## Material "Taken as a Whole"

It is also well settled that, in fulfilling our obligation to make an independent review of and judgment on the material in question, we must view that material as a whole and not look narrowly at isolated fragments of it. In *Dillingham v. State, supra,* at 673-677, Judge Thompson reviewed thoroughly the case law—emanating from the Supreme Court, the Maryland Court of Appeals and various United States Courts of Appeal throughout the country—mandating this broad viewing of the suspect material, and it is unnecessary to restate that discussion here.

In dealing with a situation closely analogous to the one at bar, a situation where another, earlier issue of *The Washington Free Press* was being reviewed but where particular attention was focused on a cartoon depicting crudely an act of masturbation, Judge Thompson said in *Dillingham* at 677-678:

> "We think the cartoon is inextricably bound to the iconoclastic nature of the entire periodical. While we most emphatically disagree with the ideas expressed in this periodical, there is no suggestion they were not sincerely held, or more importantly, were inserted merely to provide a pseudo-intellectual background for the publication of the cartoon. While different topics are considered in the different articles of the newspaper, their attitudes and ideas are uniform throughout."

It is, furthermore, quite clear that the trial judge in this case arrived at his conclusion based upon a consideration of the newspaper in question "taken as a whole." He had, in anticipation of trial, read a copy of the paper on the afternoon before trial. No objection was made to this. In the course of opening argument, appellant's counsel stated at one point, "Even the hard core test, Your Honor, has to consider the material taken as a whole."

The Court replied, "I am considering it as a whole." In the course of rendering his verdict, the judge stated, "I am quite familiar with the full contents. I am not passing on just the cartoon itself. We gather what the entire message shows."

### The Material in this Case

In making then our independent analysis of the allegedly obscene material in this case "taken as a whole," we are confronted with Issue No. 5 of Volume 3 of *The Washington Free Press*, the particular issue of the bi-weekly paper covering the period of the first two weeks of June, 1969. The masthead also reveals that the paper operates out of 1522 Connecticut Avenue in the District of Columbia, sells for 20 cents per copy within the District and for 25 cents per copy outside of the District. It is a 24-page, tabloid-sized newspaper. Pages 2 through 11 and 14 through 23 are in black and white. The front and back pages and the center spread are in yellow, orange and pink color.

Page 1 establishes the clear and unwavering theme of the entire issue. An upraised arm holds aloft a torch from which yellow and pink flame emanates in psychedelic radiance. Within the flame is discernible the leering face of a belled and spangled joker, clown or harlequin, reminiscent of the Italian *commedia dell'arte*. The caption is "Berkeley is Burning. . .All Over the Country."

Page 2 contains a *reductio-ad-absurdum* satire of a letter-to-the-editor from a repentant marihuana smoker. It contains an article on a protest radio show in the District of Columbia, some news on rock concert festivals coming up during the summer of 1969 and some practical advice on how sympathizers with Cesar Chavez and the striking grape workers could harass the Safeway Stores.

Page 3 contains a picture of a National Guardsman aiming a rifle at a running individual, apparently on the campus of the University of California at Berkeley. It

contains pointedly anti-government articles on (1) the trial of three individuals for destroying Draft Board records and (2) the trial of another individual for refusing to report for induction into the armed services. It contains a satirical article on an individual arrested for flying a kite with tongue-in-cheek reference to kite flying leading "to heavier stuff." Under the title of "NARC" it shows the picture of an ostensible District of Columbia undercover agent with its implied warning to those violating any of the narcotics laws to beware of this penetration agent. It also contains a short quotation from Marshall McLuhan.

Page 4 consists largely of an editorial criticizing the Citizens Advisory Councils established to work with the Police Department in the District of Columbia. It also makes reference to a so-called "Red Alert" at the University of Colorado.

Page 5 is a reprint from *The New York High School Free Press* commending student rebellion in the public school systems.

Page 6 consists of short excerpts from newspapers all over the world reporting demonstrations and protests and allegedly repressive police conduct. It also contains a short quotation from Senator Edward Kennedy of Massachusetts.

Page 7 contains two by-lined articles, one strongly critical of police conduct in Montgomery County and the other strongly critical of the conviction in the Circuit Court for Montgomery County of Brint Dillingham for the sale of allegedly pornographic material.[2]

Pages 8 and 9 consist largely of an editorial responding to one in *The Diamondback,* the student newspaper of the University of Maryland, and dealing with President Nixon's policies in Vietnam; an article about violent student revolt in Japan and an article strongly castigating the "imperialist" activities of the Rockefeller

---

2. See our opinion in *Dillingham v. State, supra,* reversing that conviction for the sale of Volume 2, No. 52, of *The Washington Free Press.*

brothers in Venezuela. A small box on page 8 urges a nationwide boycott of the Dow Chemical Company; another box on page 9 criticizes allegedly repressive tactics of the American Government in Puerto Rico.

Pages 10 through 14 are devoted to the recurring battles between student rebels and university and government officials on the Berkeley Campus. These pages include the center spread where the type turns red and is surrounded by a yellow tree of climbing, stretching, groping, nude figures culminating in a clenched fist. A brief quotation from Lenin is interspersed amid the reports from Berkeley. A large part of the reported trouble swirls about the use of a so-called "People's Park", an unimproved plot of ground apparently commandeered and then landscaped by the student rebels and then re-commandeered by the University. Apropos of the "People's Park" controversy, in a box on page 10 and superimposed over a picture of the late Chief Sitting Bull, poised with cradled rifle, is a short article charging that the governments of Mexico, the United States and California, respectively, had stolen the park land from the Costanoan Indians.

Pages 16 and 17 contain an article on the mutiny of some three hundred prisoners in the stockade at Ft. Ord, California; a short excerpt about one of the honor guards of the Tomb of the Unknown Soldier being against the war in Vietnam; advice to Army deserters, giving practical hints on seeking sanctuary in Canada, and other short pieces all involving the general theme of revolt within the ranks of the military service.

Skipping for a moment pages 18 and 19, page 20 is devoted almost exclusively to a by-lined editorial on the Students for a Democratic Society and criticizes, ironically, too much dissent within the ranks of the dissenters.

Page 21 contains several advertisements, one for a show of some sort scheduled at Constitutional Hall on June 20, one for foreign car repair and one for a haberdashery featuring "the freakiest shirts from Africa, In-

dia and the West Coast, dress bells, funky hats and French underwear in five colors." The page also manages to direct bipartisan barbs at both former President Johnson and at the daughter of Vice-President Agnew.

Pages 22 and 23 are the classified ad section, containing a bizarre assortment of at times risque, at times humorous, and at times apparently serious two to four line insertions.

Page 24 closes off the issue with a large center picture of helmeted, gas-masked soldiers holding rifles with bayonets at the ready, above and below which picture is the caption "You Don't Need a Weatherman to Tell Which Way the Wind Blows."

Throughout all of these pages there is almost no reference to sex whatsoever. The copy is salted generously with graphic, punchy Saxon verbs and nouns — those which are politely referred to as "the four-letter words." There is, to be sure, a strongly discernible tendency never to use trisyllabic Latin wherever monosyllabic Saxon will do. This employment of language, however, is consistent with the general theme of the issue, particularly where linguistic conventions are under the same attack as all other conventions of "the old order." The use of Saxon taboo words, however, is no more frequent or pointed than in the works of such first magnitude writers as James Joyce, D. H. Lawrence and Henry Miller nor in those of the dozens of best-selling second magnitude literary figures such as Norman Mailer and Philip Roth. The language is much tamer than that of the critically-acclaimed and popularly-accepted musical "Hair", which has been playing to packed houses in New York and London for three years, has successfully toured the provinces and has sold its phonographic albums by the millions.

Indeed, the taboo words, when used, are totally devoid of sexual connotation but are used in their latter-day capacities simply as expletives and universal adjectives. The smashing of the linguistic taboo, in this context, might be viewed by some as nothing more than the final chapter of the Chaucerian Revolution, liberating native

English from its second-class status as something common or vulgar vis-a-vis the more polite Latin and French of the cloister and the court. Taste may continue to operate as it will but American courts owe no duty to Plantagenet pride.

At this point, the issue of *The Washington Free Press* before us is seditious perhaps, but no more titillating than *Das Kapital* or *Mein Kampf*.

Only with respect to pages 18 and 19 can a case be made, arguably, for obscene content. These two pages contain a cartoon comic strip, ostensibly reprinted from *Jive Comix*, and drawn by Robert Crumb. The entire upper half of page 18 contains simply the masthead or title of the cartoon. In a large circular panel, filling the half page, are five animal-faced, stock cartoon characters in a street scene. Two of them bear striking resemblances to Walt Disney's Mickey Mouse and Horace Horsecollar. Silhouetted against the skyline behind them, factories belch forth great clouds of smoke. Above the clouds a smiling sun peeks through. The title is given as "Don't Gag On It. . .Goof On It!". At the bottom of the panel, a small box indicates that the cartoon is "A Sonnet Upon It" by R. Crumb.

The lower half of the page is dominated by the pronoun and verb in the imperative mood "Ya Gotta. . .", followed by six square panels each containing a predicate clause to the preceding "Ya Gotta" with an accompanying cartooned picture. These six predicate clauses and pictures are:

(1) "Git On It!!", showing a smiling chipmunk driving a Good Humor-type truck with the panel on the side stating, "Charlie Chipmunk's Jolly Time Cheer Mobile." The truck is going, "Beep, beep."

(2) "Hit On It!!", with a picture of a smiling animal of some sort snapping his fingers as if he had just come up with an idea.

(3) "Shit On It!!", with a picture of a smiling, but somewhat guilty-looking, Porky Pig-type character walk-

ing naughtily away from what appears to be a pile of excrement.

(4) "Sit On It!!", showing a grinning character riding upon the back of a large bare-breasted and big-buttocked cannibal-looking woman as he swats her buttocks with a stick.

(5) "Tit On It!!", showing a large female breast with erect nipple being tickled by the forefinger of an outstretched hand.

(6) "Quit On It!!", showing a distraught character obviously committing suicide by leaping from the roof of a tall building in what appears to be a tenement district of a large city.

On the second page begins the second stanza to the command of "and ya gotta. . .". Its predicate is simply a single vertical panel with Groucho, Chico, Harpo and Zeppo Marx smiling in from the right-hand margin and saying, respectively, "Fuck It!", "Suck It!", "Truck It!" and "Shuck It!". Harpo is tooting a horn which the trial judge described as "a phallic symbol." In the lower right-hand corner of the panel a quacking duck adds his predicate of "Duck It" and in the lower left-hand corner a laughing dog contributes his predicate, "Yuk It!".

The upper right-hand quadrant of page 19 is filled with stanza three which begins "you ought to. . .". The first predicate is a horizontal panel showing two dancing males doing a vaudeville-type, soft-shoe routine and saying, respectively, "Hang It!" and "Bang It!". Under that, a pair of vertical panels show a top-hatted, cigar-smoking caricature of a millionaire, reminiscent of Lord Plushbottom, under the words "Milk It" and a leaner, hungrier-looking man rubbing his hands together under the words "Bilk It." The final pair of predicate panels in this stanza show penises being squeezed and turned under the respective captions of "Yank It!" and "Crank It!".

Stanza four leads off the lower half of the second page with the command "you can always. . .". Six small panels then contain the following predicate phrases with accompanying pictures:

(1) "Hog It. . .", showing the smiling face of a pig.

(2) "Flog It. . .", showing a nude woman with a manacle around her neck and chained to a wall as well as showing a hand bearing a cat-o-nine-tails.

(3) "Bog It. . .", showing an automobile getting stuck in the mud.

(4) "Sog It. . .", displaying a pitiful-looking, Denny Dimwit-type character with a limp penis in his hand.

(5) "Grog It. . .", showing simply the upturned feet of an obviously drunken and prostrate individual surrounded by eight empty cans of beer.

(6) "Clog It. . .", featuring a very unattractive, freckled, cross-eyed and distraught-looking female in an act of fellatio with an oversized penis.

Stanza five begins "hey listen, you can" and then follows with six more small panels bearing the respective predicate phrases and accompanying pictures:

(1) "Eat It. . .", showing a male figure licking his chops and obviously preparing for an act of cunnilingus with an upturned vagina.

(2) "Greet It. . .", showing a smiling figure looking out of her window and greeting a smiling and rising sun.

(3) "Heat It. . .", showing two grotesquely exaggerated figures—one female and one male—with the male about to take a nipple of the female in his teeth.

(4) "Beat It. . .", showing a nude woman bent over with buttocks upraised and presented for a spanking or a beating.

(5) "Reet It. . .", showing a zoot-suited character of World War II vintage who appears to be shaking a pair of dice in his hand.

(6) "Zeet It. . .", simply showing a smiling Negro male of an apparently jazzy type, sporting dark glasses, scarf and beret.

The penultimate panel shows the faces of an exultant man and an exultant woman. He is saying, "Oh Baby! Hug It, Chug It, Bug It, 'n' Plug It!!". She is saying, "Mmm. . .Wine It, Dine It, Shine It 'n' Sign It!!".

The final panel shows ten happy little men in a chorus

line singing in unison, "Stew It, Shoe It, Even Chew It If Ya Want, But. . .DO IT!!". A little box in the lower right-hand corner says simply, "The End. . .Now Go To It!!".

This then is the material upon which we must make a constitutionally-mandated independent, reflective judgment to decide whether, under the First Amendment, its dissemination shall be permitted or whether those connected with that dissemination shall go to jail.

### The Roth Test

The standard we are to apply was recited initially in *Roth v. United States* and *Alberts v. California,* 354 U. S. 476, reiterated in *Jacobellis v. Ohio, supra,* elaborated in *Ginzburg v. United States,* 383 U. S. 463, adjusted in *Mishkin v. New York, supra,* and summarized in *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General* (the *Fanny Hill* decision), 383 U. S. 413. (Hereinafter, this entire formula will be referred to simply as the *Roth* test.) *Dillingham v. State, supra; Lancaster v. State, supra; Donnenberg v. State, supra; Levin v. State, supra.*

To come within the definition of obscenity, under that standard:

> "Three elements must coalesce; it must be established that:
> 1) The dominant theme of the material taken as a whole appeals to a prurient interest in sex.
>    a) where the material is designed for and primarily disseminated to a clearly defined deviant sexual group, rather than the public at large, the prurient-appeal requirement is satisfied if the dominant theme of the material taken as a whole appeals to the prurient interest in sex of the members of that group.
> 2) The material is patently offensive because it affronts contemporary community standards

relating to the description or representation of sexual matters.

3) The material is utterly without redeeming social value.

Each of the above three federal constitutional criteria must be applied independently and neither be weighed against nor canceled by any of the others.

a) As an aid to determining the question of obscenity, the setting in which the material was presented may be considered. Thus evidence of pandering — 'the business of purveying textual or graphic matter openly advertised to appeal to the erotic interest—is relevant' and 'where a purveyor's sole emphasis is on the sexually provocative aspects of his publications, a court could accept his evaluation on its face value.' " *Dillingham v. State, supra* 672.

Measuring the material before us in this case by this standard, not only do not all three of the necessary elements coalesce, but none of the three even stands alone.

*Prurient Interest*

It is first necessary to establish just what the dominant theme of the material is before we can determine whether that theme would appeal to the prurient interest of anyone.

Mr. Paul Richard, the art critic of *The Washington Post,* testified as an expert witness for the defense. Mr. Richard was educated at Harvard and at the graduate school of the University of Pennsylvania. He travelled extensively in Europe, worked with the Federal Commission of Fine Arts and had been the art critic of *The Washington Post* for three years. After analyzing the questioned cartoon in this case, he testified that the dominant

theme of the cartoon was "to make the reader laugh, to loosen the reader up, and to make him stop choking on whatever variety of personal repression had made him gag in the past."

Mr. Walter W. Hopps was also called as a defense witness. He received his training in the arts at Stanford University and at the University of Chicago. He taught in the humanities program at U.C.L.A. He served for a time as curator of the Pasadena City Art Museum, then became the director of the Washington Gallery of Modern Art in the District of Columbia and at the time of trial was acting director of the Corcoran Gallery of Art in Washington, the third oldest public art museum in the United States. He testified as to the theme of the questioned cartoon in the following terms:

> "I think that the message is one of what I would call three things combined. It is serious and at the same time it is light-hearted or humorous. The underlying tenor or philosophy of this kind of art is rather overt hedonism, in the sense — I will leave it at that."

The court then asked him what he meant by hedonism. He replied:

> "Joyously pleasure seeking, in the sense that I would apply that word to the graphic art, let's say, of some of Toulouse Lautrec's work. I would clearly apply it to the engravings of both Henri Matisse and Pablo Picasso, where the whole basis of their art involves congress between females and males and animals, which is a shocking and perverted subject inherently, although the way Picasso has treated it, with such high artistry, it is not only good art but it has a good spirited hedonistic philosophic basis on which it rests."

In measuring then the prurient appeal of this theme, we must do so in terms of a particular audience. There

was no evidence in this case to indicate that, under *Mishkin*, it was "designed for or primarily disseminated to a clearly-defined deviant sexual group." We must, therefore, measure prurience in terms of its appeal to the average person.

Mr. Richard stated that, in his opinion, the dominant theme of the cartoon did not appeal to prurient interest. He elaborated as follows:

> "I get to see a lot of art as an art critic, and I have seen art that I felt was far less funny than this particular comic strip.
> I think that the point of a comic strip is, as the word implies, often laughter and delight. And that kind of humor as I see here before me, with the Marx Brothers and people dancing on the stage, and that sort of cartoon, rich man with his top hat and his fur coat, that sort of humor, it is my opinion diminishes rather than enhances any move toward prurient interest. It is very hard to make the Marx Brothers and the quacking duck and Mickey Mouse laughing appeal to prurient interest."

Mr. Hopps was equally emphatic in his opinion that the cartoon did not appeal to prurient interest. He was asked, "Why not?" and replied:

> "I think that the stylized technique of cartooning, which is an artistic development really stemming from the 19th century, involves more art and less literal depiction than anything that normally would appeal to the prurient interests could allow, in other words, this does not look realistic to me. It involves artistry and stylization. Further, it is very fine cartooning, very interesting, I think significant cartooning inherently, and does not fulfill any test that I feel relates to pornographically intended imagery."

We have no difficulty in ascertaining the dominant theme of the entire newspaper as a whole. The paper is

obviously of the genre of *The Berkeley Barb*, *The Village Voice* and their now numberless progeny all over the country—generally referred to collectively as the underground press. One theme runs relentlessly throughout and it is one of dissent, rebellion, revolution, iconoclasm, hedonism, libertarianism, anti-authoritarianism and anti-establishment protest in every conceivable manifestation; which is to say, its dominant character is polemic rather than prurient. In terms of purpose, it is, to be certain, not *The Ladies' Home Journal.* Neither, however, is it *Playboy.*

Upon our independent review of the material, we find and therefore we hold that, applying contemporary community standards, not even the dominant theme of the cartoon taken as a whole, far less the dominant theme of the entire newspaper taken as a whole, appeals to the prurient interest of the average person.

### Patent Offensiveness

It is axiomatic that to judge whether something offends contemporary community standards, one must know what those contemporary community standards are. In this case, the State neither showed nor offered any evidence whatsoever as to the standards prevailing in Prince George's County, the State of Maryland or the United States, whichever of those communities will ultimately be deemed the appropriate "community." *Jacobellis v. Ohio, supra.* By way of defense, the appellant did make two abortive attempts to offer testimony as to the prevailing community standards, at least within Prince George's County.

He offered first the testimony of Mrs. Ann Sweat, the assistant coordinator of adult services for the Prince George's County Memorial Library. Mrs. Sweat was in charge of the selection of all adult materials for the entire public library system of the county. She had been an English major at the University of Pennsylvania and had received a Master's Degree in Library Science from the

Drexel Institute of Technology. She had been employed in library work for eight years. She had previously worked at the University of Pennsylvania Library for two years, as a branch librarian at the Suitland Branch of the Prince George's County library and as an assistant librarian at the Florida Key's Junior College in Key West.

As the person responsible for selecting the materials to go into the libraries of Prince George's County, she made selections on a weekly basis. She testified that in making her selections, she did take into consideration "such things as the current community standards for morality and sexual practices and so forth." She indicated that she had a familiarity with the standards of her community and indicated that she thought "it is the responsibility of the librarian to find out what is the nature of the community in which she is employed." It was proffered that the Prince George's County library system did carry issues of *The Washington Free Press.*

It is clear from the lengthy preliminary examination that, although the two considerations kept merging into each other, Mrs. Sweat was offered as an expert on both redemptive literary value and community standards. The trial court declined to let her testify. In its rejection, the court seemed to be considering exclusively the question of her expertise as to literary value:

> "The Court: Why couldn't a layman give you the overall value of the material the same as this lady?
> Mr. Dukes: Your Honor, a layman can give you an overall opinion on laying brick, but a man laying brick for 15 years could give you a better opinion.
> The Court: I don't want to be absurd. I mean the average man that works for a living, goes home, reads the paper, graduated from high school, college, why wouldn't he be just as qualified on the test of literary achievement and decency as she would?"

The appellant also offered James Harold Hamilton, the branch librarian at the Suitland Branch of the county library system. Mr. Hamilton was a graduate of the University of Illinois, majoring in Library Arts. He received a Master's Degree in Library Science from the University of Maryland. He was involved in the book selection process. He indicated that he regularly read various reviewing media, *The Publisher's Weekly*, *Library Journal*, *New York Review of Books*, and a number of others. He was a member of the Maryland Library Association and of the American Library Association. He indicated that he was a regular reader of the newsletter of the Intellectual Freedom Division of the American Library Association, a newsletter that dealt frequently with such questions as censorship and underground newspapers. The court below refused to permit him to testify.

The court also refused to permit the appellant to introduce a number of magazines and other newspapers purchased freely in various establishments in Prince George's County during the period of December 15, 1969, through January 25, 1970. These items were offered as "an indication of the basic community standard and what the average man considers not patently offensive as a whole." The court refused to receive them:

> "I can't see the relevancy. Just because one man commits a wrong and gets away with it doesn't justify another man committing a wrong and getting away with it, too. . . .
> On the basis it is not pertaining to this particular issue we will entertain the motion to object and sustain it."

We believe that the refusal of the court below to receive the testimony of the two witnesses offered by the appellant, who might have thrown some light on contemporary community standards, and the refusal of the court below to receive the exhibits of other newspapers and magazines then circulating freely in the Prince George's County area for comparison purposes on the subject of

contemporary community standards were abuses of the court's discretion. *Yudkin v. State,* 229 Md. 223, 228-230; *Dunn v. Maryland Board of Censors,* 240 Md. 249; *Smith v. California,* 361 U. S. 147, at 164 (concurring opinion of Frankfurter, J.) and at 172 (concurring opinion of Harlan, J.) ; *Model Penal Code,* Section 251.4 (4) ; *In Re Harris,* 366 P. 2d 305 (Cal. 1961).[3]

This failure of the trial court to afford the appellant an opportunity to prove what he believed to be the prevailing community standard is not material, however, in view of our belief that the State failed utterly to make even a *prima facie* showing of any community standard whatsoever. We feel, as did Judge Orth in his concurring opinion in *Dillingham v. State, supra,* at 715:

> "I cannot determine from the record whether or not the material affronts contemporary community standards relating to the description or representation of sexual matters. The State, as the opinion of the Court points out, did not prove what the contemporary community standards are, either national or local. . . . It is not possible to determine that the material here affronted contemporary community standards when the standards themselves are not delineated. Thus the second element was not proved and this alone would be good reason to reverse the conviction."

### Redeeming Social Value

Mr. Richard, the art critic for *The Washington Post,* testified that Robert Crumb is a major artist and that the cartoon in question has "a great deal of redeeming social value." He indicated that he had written twice about Mr. Crumb, which was unusual since he normally does not re-

---

3. See also Lockhart and McClure, *The Law of Obscenity and the Constitution,* 38 Minn.L.Rev. 295, fns. pp. 348-350; Lockhart and McClure, *Censorship of Obscenity: The Developing Constitutional Standards,* 45 Minn.L.Rev. 5, 95-99.

view "one man's work more than once." He testified that he had seen the work of Mr. Crumb in art magazines and in art museums. He testified at one point:

> "I think the man that did these, to my mind very unusual drawings, is a first rate artist, has been recognized as such, and that artists are valuable to the society in which we live, and the good ones help us all out. . . .
> I think that he is doing something here that artists have been doing for a long time, and that is to change our ways of thinking and push our horizons out a little bit, and to get us to think again freshly about where we are. The artists have been doing that for hundreds of years. Art schools certainly teach you that."

He was asked what the cartoon was trying to make the reader think about and replied that it "has a lot to do with getting rid of repressions, sexual and otherwise, and it is encouraging freedom." He testified further that he had seen this particular cartoon on exhibit at the Dupont Workshop of the Corcoran Gallery of Art.

Mr. Hopps testified that in his opinion the cartoon in question "does have redeeming social value." He indicated that Mr. Crumb had stature as a major artist and that he had applied his abilities at a high standard of performance on this particular cartoon. He indicated that the cartoon in question had been on display at the Corcoran Art Gallery. With respect to this exhibit, he testified as follows:

> "Last year, in the spring of last year, I and my staff assembled an exhibition on what is called comics, art of contemporary graphic cartoonists. We selected what we felt to be the twelve, approximately twelve, major artist draftsmen of this medium from around the United States. Crumb was one of the twelve. Six original drawings of his were included in the exhibits, as well

as numerous imprintings of his cartoons. In this latter category I included this particular one.

Q. Was there any evaluation with respect to the selection of which of these particular works would go into the exhibit, having to do with which were good works of his and which were not?

A. Yes. The matter was reviewed as to artistic merit and appropriateness for inclusion, which does take into account the constituency or the visiting public of the museum, by myself, Pablo Denese, Curator, James Harrison, at that time Director of The Corcoran Gallery of Art, and Mr. Chapin, Executive Vice President of the Board of Trustees.

Q. I take it the conclusion was this was one of his better works, the reason it was included?

A. It was deemed worthy to include."

The court below gave no weight to the testimony of these two experts. It summarized their testimony as follows:

"And we have an art critic, we have a public official—I don't know, I guess the Corcoran Art Gallery is not a public art gallery—well, we have an official with that art gallery telling me as a layman, trained in the science of law, sociology and criminology, that this is art. It is repulsive to even suggest it.

As the trier of the fact in this case, based upon the exhibit 1, I disbelieve the evidence of both of the so-called professional witnesses, because I feel that it is so farfetched that it isn't even worthy of belief. That is what I think of your professionals."

In making our own independent, reflective judgment upon the material, we feel that the view expressed by Judge (now Chief Judge) Hammond in *Dunn v. Mary-*

*land Board of Censors, supra,* at 255, even though dealing with alleged obscenity in the context of motion picture censorship, is pertinent:

> "In our view, neither the judge who may sit in the circuit court to review the action of the Board nor the judges of this Court ordinarily would be qualified to determine whether a film exceeded these constitutional standards or tests without enlightening testimony on these points."

We cannot permit a sense of moral indignation to be substituted for the constitutionally mandated test for obscenity. We find the uncontradicted opinion of two men learned in the arts helpful in making our evaluation of the questioned cartoon.

In looking at the entire newspaper, the redemptive social value speaks for itself. Virtually every page of the paper is packed with political comment and with vigorously urged political views. Many, if not most, of the views are unpopular. They are, to many persons, outrageous. They are, therefore, socially valuable—not despite their unpopularity but by virtue of that unpopularity. In this regard, the words of *Terminiello v. Chicago,* 337 U. S. 1, 4, are highly pertinent and profoundly instructive:

> "Accordingly a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea."

See also *Edwards v. South Carolina,* 372 U. S. 229, 237-238.

Upon our independent review of the material, we find

and therefore we hold that not even the cartoon taken as a whole, far less the entire newspaper taken as a whole, is utterly devoid of redeeming social value.

## No Evidence of Pandering

Nor was there in this case any evidence, whatsoever, of the sort of pandering condemned by *Ginzburg v. United States, supra,* which may sometimes serve as an aid in determining on which side of the line otherwise close material may fall. There was no evidence that the appellant advertised this particular issue of *The Washington Free Press* in any fashion, nor was there evidence that he displayed it or presented it to the customer in such a manner as to place "emphasis on the sexually provocative aspects of the publication." Pandering is simply no factor in this case.

## The "Hard-Core" Shortcut

Even if, upon our independent review of the material before us, we had not found that it failed to meet any, let alone all, of the three standards for obscenity outlined by the *Roth* test, the conviction of the appellant here would still have to be overturned because of the failure of the State to produce any evidence other than the questioned issue of *The Washington Free Press* itself.

The State had the burden of proving (1) what the dominant theme of the work taken as a whole was, (2) whether that theme would appeal to a prurient interest in sex, (3) what contemporary community standards happen to be, (4) whether the questioned material was patently offensive in that it affronted those community standards, and (5) that the material was utterly devoid of all redeeming social value. The necessity for the enlightening testimony of experts on all of these questions has been discussed frequently by the Supreme Court, the Court of Appeals and this Court. *Smith v. California, supra; Yudkin v. State, supra; Dunn v. Maryland State Board of Censors, supra; Sanza v. Maryland State Board of Cen-*

*sors, supra; Hewitt v. Maryland State Board of Censors,*
243 Md. 574; *Donnenberg v. State, supra,* 600-601.

This Court has recognized that in some instances the more traditional methods of proof by expert testimony may be dispensed with, where the questioned material is such "hard-core pornography" that it "screams for all to hear" as to its pornographic content. *Levin v. State, supra; Donnenberg v. State, supra; Lancaster v. State, supra.* This evidentiary shortcut has been permitted, however, only in dealing with the most flagrant pornography. Such material is typically of the "black market" variety —that sold "under the counter" in the "sleazy bookstore." This is the sort of material that we feel Justice Stewart had in mind when he indicated that although he had difficulty defining it, he "knew it when he saw it." Certainly to be found in this category would be the "stag movie," the deck of "French playing cards," the venerable "two-by-four" of schoolboy memory. This is the sort of material which permits of no reasonable dispute.

In *Lancaster, supra,* it was a "stag movie" that "screamed for all to hear." In *Levin, supra,* it was a set of photographs of erect and oversized penises without any accompanying text or even caption that "screamed for all to hear." In *Donnenberg, supra,* it was a "bondage book" with naked women being gagged and bound by straps and ropes in a variety of twisted and tortuous poses, and which was obviously aimed at the sado-masochist market, which "screamed for all to hear." It is significant that in *Donnenberg,* two other exhibits, one a magazine of pictures of nude males aimed at the homosexual market and the other a magazine of pictures of heterosexual nudity aimed at the general market, were held to be not "hard-core pornography." The convictions based upon that material could not be sustained in the absence of outside evidence as to all the necessary elements of obscenity.

Upon our independent reflective judgment, we do not feel that the material before us in this case is "hard-core pornography," which "screams for all to hear" and which,

therefore, relieves the State of its burden of producing some extrinsic evidence to establish the elements of obscenity required by *Roth*.

### *Lack of Scienter*

Even were the material before us obscene by any test, however, the conviction of the appellant here would have to be reversed because of the utter failure of the State to show any evidence of scienter on his part as required by *Smith v. California, supra.* The appellant testified that he had been carrying *The Washington Free Press* for sale continuously for three years. He operated stores both in College Park and in Ocean City, Maryland. Approximately nine or ten months before the publication of the issue of the paper before us, another earlier issue of the paper had run afoul of the law in Montgomery County (see *Dillingham v. State, supra*). The appellant read of that difficulty and immediately took steps to protect himself from legal entanglements. He checked with police authorities in Worcester County as to their attitude about *The Washington Free Press.* Those authorities suggested to the appellant that he should not carry this particular newspaper. The appellant discontinued all sales of *The Washington Free Press* from his Ocean City outlet. In Prince George's County he made a similar inquiry to Assistant State's Attorney Benjamin Wolman. He received from Mr. Wolman assurances that the State's Attorney's Office in Prince George's County was not undertaking any prosecutive drive against *The Washington Free Press* or similar underground newspapers. Mr. Wolman corroborated this testimony of the appellant. With that assurance, he continued to carry the paper in his College Park outlet.

The appellant further testified that he read *The Washington Free Press* only occasionally and that he had not seen the particular issue before us at all.

We do not mean to suggest that the State must assume the impractical, if not impossible, burden of proving that

every defendant in every obscenity case has personally read from beginning to end all of the material offered by him for sale. Proof of knowledge on the part of an entrepreneur of the merchandise he carries may be indirect, as well as direct. The knowledge may be general, as well as specific. The constitutionally mandated requirement of scienter, however, cannot be totally dispensed with.

There were not present in this case any of the suspicious surrounding circumstances from which scienter may frequently be inferred. The appellant's store did not handle this type of merchandise alone, but rather a wide variety of items for retail sale. There was no sign restricting entrance to the store to those "under eighteen years of age" or indicating that "no minors are allowed." The newspaper in question sold for twenty-five cents and was not marked up to an inordinately high price as is generally done with pornographic merchandise. The newspaper in question was not sealed in cellophane with a titillating picture on the cover so that its promise could only be further explored by one who purchased the right to tear open the cellophane. It was not grouped for display with similar items, as is so often the case with the third-rate bookstores—where all the nudist magazines can be found on one rack, all the male homosexual magazines on another, all the lesbian magazines on a third, all the sado-masochistic magazines on a fourth, etc.

There were not present here any of the extrinsic indications of knowing intent which typically surround a trafficking in pornography. There was simply no evidence, direct or indirect, of scienter whatsoever.

The dissenting opinion takes, we feel, too narrow a view of the scienter requirement under *Smith v. California, supra.* It points out, properly, that the literal holding in *Smith* was simply that a California law which eliminated all mental elements from the crime was unconstitutional. It points out further that "although *Smith* determined that a defendant criminally charged with purveying obscene material must be shown to have some kind

of knowledge of the material, the quality of that material was not defined." The dissent then points out that the Supreme Court had the opportunity in *Redrup v. New York,* 386 U. S. 767, to deal more fully with the problem of scienter, but did not do so.

The Supreme Court did, however, in *Mishkin v. New York, supra,* deal directly with the scienter problem. It made clear that the constitutionally mandated element of scienter would bar a conviction where (1) the state law failed to require scienter (the narrower holding of *Smith*) or (2) the state's evidence failed to prove scienter. The Court, in *Mishkin,* dealt first with the statutory requirement, holding that whatever doubts may have existed about the constitutional adequacy of the New York statute were removed by the authoritative interpretation of the New York Court of Appeals in *People v. Finkelstein,* 174 N.E.2d 470, that the statute in question did require "the vital element of scienter."

The Court then went on, however, to review the evidence against *Mishkin* in terms of the adequacy of the proof of scienter. Although it reiterated, as it had done in *Smith,* that the case before it made it "unnecessary for us to define today 'what sort of mental element is requisite to a constitutionally permissible prosecution,' " its review of the evidence against *Mishkin* is instructive as to the types of suspicious surrounding circumstances which might give rise to a reasonable inference of scienter:

> "Appellant's principal argument is that there was insufficient proof of scienter. This argument is without merit. The evidence of scienter in this record consists, in part, of appellant's instructions to his artists and writers; his efforts to disguise his role in the enterprise that published and sold the books; the transparency of the character of the material in question, highlighted by the titles, covers, and illustrations; the massive number of obscene books appellant published,

hired others to prepare, and possessed for sale; the repetitive quality of the sequences and formats of the books; and the exorbitant prices marked on the books. This evidence amply shows that appellant was 'aware of the character of the material' and that his activity was 'not innocent but calculated purveyance of filth.' " pp. 511-512.

\* \* \*

Good taste, whatever that elusive concept may be, will no doubt frequently be offended by much that in a democratic system is permitted freely to be published and to be disseminated. This is a small price to pay for the preservation of cherished and indispensable First Amendment freedoms. As the Supreme Court put it in *United States v. Ballard*, 322 U. S. 78, at 95:

> "[T]he price of freedom of religion or of speech or of the press is that we must put up with, and even pay for, a good deal of rubbish."

\* \* \*

Since it is possible that the State may be able to produce expert testimony, as indeed they indicated they would if the judge's finding that the material was "hard-core pornography" had not foreclosed the effort, to prove the three elements of obscenity under *Roth,* we will remand the case for a new trial to permit them that opportunity.

> *Judgment reversed; case remanded for a new trial; costs to be paid by the county council of Prince George's County.*

ORTH, J., dissenting:

I am not able to join the opinion of the Court. The material which the majority find not to be obscene I feel is hard-core pornography. It is on facing pages 18 and 19 of the Washington Free Press, vol. 3, no. 5, June 1

through June 15, 1969. The text and cartoons there appearing have been described in the majority opinion but the printed word cannot give the full flavor of them. They are crudely drawn but graphic in depicting what they intend to convey. The material is an exhortation to do the things illustrated, ending with the command, "Stew It, Shoe It, Even Chew it If Ya Want, But . . . DO IT! * * * The End . . . Now Go To It." The things implored to be done, appropriately illustrated, include "Shit on it", "Tit on it," "Fuck it", "Suck it", "Yank it", "Crank it", "Flog it", "Sog it", "Clog it", "Eat it", "Heat it", "Beat it". The drawing under "Tit on it" is a close-up of one enormous female breast with a finger tickling an erect nipple. "Yank it" is illustrated by depicting the lower part of a gross stomach, a penis, scrotum and pubic hair. The penis, outsize both in length and diameter and in full erection, is in the grasp of a hand of another person and is being squeezed. Under "Crank it" there appears what seems to be the same gross stomach, penis, scrotum and pubic hair with the same hand twisting or rotating the penis. "Flog it" shows a naked female secured by a chain running from a collar around her neck to a ring in the wall. Her hands are apparently bound behind her back. She has massive upstanding breasts with large erect nipples. A hand holding a whip of a cat-o-nine-tails type protrudes in a corner of the frame in a position indicating it is being used to stimulate the woman's genitalia. "Sog it" is illustrated by a debilitated, emaciated, grotesque male fondling his large and thick but limp penis. "Clog it" shows in profile the middle torso, from the lower stomach to the upper thigh, of a man standing upright, clearly depicting his scrotum and pubic hair. His penis, extremely large in diameter, is thrust its entire length in the mouth of a woman. One of her large breasts can be seen. It is bare and marked by an upstanding teat. Her face is distorted by the penis thrust down her throat. Her heavy lidded eyes are crossed, and there are droplets of what may be perspiration or semen flying in the air around her face. "Eat it" is illustrated by a drawing of

the upper torso of a man. He is standing between a woman's wide spread legs. Her genitalia are fully exposed and his hands are stretching open her vulva. He is licking his lips and on his face is an expression of pleasurable anticipation. There is a discharge popping out of the woman's genitalia. The subject "Heat it" is an obese woman, naked, distinguished like the others by massive upstanding breasts with large paps. She is seated, her head thrown back, her eyes closed, her mouth open, her tongue lolling. What appears to be clouds of steam and drops of perspiration surround her head. A naked man is kneeling at her side. He is holding her left breast in his hand and its nipple is between his bared teeth. "Beat It" features another fat woman, naked except for shoes, bending over from the hips, her large buttocks full face to the viewer. She is looking over her shoulder, a smile on her face. This then, its full scandalous effect somewhat lost in the describing of it, is actually the material which in the "constitutionally—mandated independent, reflective judgment" of the majority is not obscene.

My independent constitutional appraisal of this material leads inevitably and inexorably to the conclusion that it is hard-core pornography. It enjoys all the characteristics of such obscene matter which we discussed in *Levin v. State,* 1 Md. App. 139, 144-146, cert. denied, Court of Appeals of Maryland, 247 Md. 740 and Supreme Court of the United States, 389 U. S. 1048. We summarized the characteristics in *Donnenberg v. State,* 1 Md. App. 591, 600. The material here focuses predominantly upon what is sexually morbid, grossly perverse, and bizarre without any artistic merit or scientific purpose of justification. There is no desire to portray the material in pseudo-scientific or "arty" terms. It goes substantially beyond customary limits of candor and deviates from society's standards of decency in the representation of the matters in which it deals. It is not designed to be a truthful description of the basic realities of life as the individual experiences them but its main purpose is to stimulate erotic response. It has a patent absence of any redeeming

social value. It can be recognized by the insult it offers, invariably, to sex and to the human spirit. It speaks for itself and screams for all to hear that it is obscene. Not to hear its screams is to be deaf indeed. I hear them loud and clear.

There has been only one test of obscenity applied by the Court of Appeals and this Court since the opinion in *Roth v. United States*, 354 U. S. 476, in which was also decided *Alberts v. California*. We set it out in *Donnenberg v. State, supra*, at 598, as we found it established from the definition of obscenity in *Roth*—"whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interests" — as reiterated in *Jacobellis v. Ohio*, 378 U. S. 184, elaborated in *Ginzburg v. United States*, 383 U. S. 463, adjusted in *Mishkin v. New York*, 383 U. S. 502 and summarized in *A Book Named 'John Cleland's Memoirs of a Woman of Pleasure' v. Attorney General*, [the *Fanny Hill* decision] 383 U. S. 413.[1] The Supreme Court stated it in *Redrup v. New York*, 386 U. S. 767, 770-771:

---

1. We would now add: "and as emasculated in *Stanley v. Georgia*, 394 U. S. 557." Prior to *Stanley* the opinions were within the context of the unequivocal holding in *Roth*, at 485, that "* * * obscenity is not within the area of constitutionally protected speech or press." *Stanley* seemed to place obscenity squarely within the protection of the 1st and 14th Amendments by holding, at 568, that those Amendments prohibit making mere private possession of obscene material a crime. But it asserted that *Roth* and the cases following were not impaired by its holding. Emboldened by this assurance of the continuing validity of *Roth* and the cases following, I am constrained to agree that we are to continue the test under *Roth-Alberts* for want of something better approved by the Supreme Court. See concurring opinion in *Dillingham v. State*, 9 Md. App. 669, 700-719.

We note, however, that of late the Supreme Court has taken to rely on *Redrup v. New York*, 386 U. S. 767, in summarily setting aside state findings that material was constitutionally obscene, but not, of course, without concurring and dissenting opinions. See, for example, *Cain v. Kentucky*, 90 S. Ct. 1110; *Walker v. Ohio*, 90 S. Ct. 1884; *Hoyt v. Minnesota*, 90 S. Ct. 2241. *Redrup* recognized four disparate views of the individual justices or combinations of justices as to the constitutional question of obscenity and set them out at 770-771. The Court held at 771:

"Whichever of these constitutional views is brought to bear upon the cases before us, it is clear that the judgments cannot stand."

"(a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex;

(b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters;

(c) the material is utterly without redeeming social value * * *

[T]he three elements must coalesce."

It is patent that if material falls within what may be considered this Court's definition of hard-core pornography as set out in *Donnenberg,* it meets the test of *Roth.* And I think our definition of hard-core pornography, as it must, "stay[s] within the bounds set by the constitutional criteria of the *Roth* definition." *Mishkin v. New York,* 383 U. S. 502, 507.[2]

For material to be obscene in the constitutional sense, the three elements of the *Roth* test must be present and

---

2. I note that in his concurring opinion in *Jacobellis v. Ohio, supra,* Mr. Justice Stewart concluded that under the 1st and 14th Amendments criminal laws in the area of obscenity were constitutionally limited to hard-core pornography. He did not attempt to define it but said: "* * * I know it when I see it * * *." 378 U. S. at 197. However, in his dissenting opinion in *Ginzburg v. United States, supra,* he observed: "There does exist a distinct and easily identifiable class of material in which all of these elements [of the *Roth* test] coalesce." 383 U. S. at 499. This material, he said, was hard-core pornography, and "in order to prevent any possible misunderstanding", he set out in note 3 at 499 a description "borrowed from the Solicitor General's brief, of the kind of thing to which I have reference." Note 3 reads:

"* * * Such materials include photographs, both still and motion picture, with no pretense of artistic value, graphically depicting acts of sexual intercourse, including various acts of sodomy and sadism, and sometimes involving several participants in scenes of orgy-like character. They also include strips of drawings in comicbook format grossly depicting similar activities in an exaggerated fashion. There are, in addition, pamphlets and booklets, sometimes with photographic illustrations, verbally describing such activities in a bizarre manner with no attempt whatsoever to afford portrayals of character or situation and with no pretense to literary value. All of this material * * * cannot conceivably be characterized as embodying communication of ideas or artistic values inviolate under the First Amendment. * * *."

coalesce whether or not the material is hard-core pornography. The distinction is that if material is hard-core pornography, no proof other than the viewing of it is required to determine that it is obscene. *Donnenberg v. State, supra,* at 600.

The majority conclude that the material here is not hard-core pornography. They do so in a summary manner. Although recognizing that "in some instances" proof other than the viewing of the material may be dispensed with, they state that this "evidentiary shortcut" has been permitted "only in dealing with the most flagrant pornography." I see a distinction with a real difference between their "most flagrant", which appears to be of their own coinage, and Mr. Justice Stewart's "easily identifiable" (concurring in *Ginzburg v. United States, supra,* at 499) or the "clearly identifiable" as used in the opinion of the Court in *Redrup,* at 770. And while, as the majority point out, such material may be "typically of the 'black market' variety—that sold 'under the counter' in the 'sleazy bookstore' ", it is obvious from Mr. Justice Stewart's elaboration on his concept of this class of material, note 2 *supra,* that it is not so limited. In any event, I do not appreciate why a deck of "French playing cards" or "the venerable 'two-by-four' of schoolboy memory" is "most flagrant" obscenity and the material here is not. The majority seem to be in accord that the matter in *Donnenberg, supra* and *Levin, supra* was hard-core pornography. But accepting, *arguendo,* the majority's criterion of "most flagrant", I am unable to understand why the material in those cases was "most flagrant" and the material here is not. In *Levin* it consisted of photographs of a nude male with his penis in erection; there was no depiction of sexual activity and no textual exhortations as here. In *Donnenberg,* the photographs suggested, but did not depict, as does the material here, unnatural sexual practices. And while it is clearly evident that the stag movie in *Lancaster v. State,* 7 Md. App. 602, was hard-core pornography, it does not necessarily follow that the material here is not.

Although I believe that the strips of drawings in comic book format, here before us, grossly depicting perverted and unnatural sexual activities in an exaggerated fashion, are unquestionably of that distinct and clearly identifiable class into which hard-core pornography falls, I nevertheless accent what is obvious in the circumstances by discussing how the three elements of *Roth* are to be found from a mere viewing of the material so that no other proof of its obscenity is required.

The appeal to prurient interest requirement must be construed in the light of the test of obscenity as stated in *Roth*: "whether to the average person, applying contemporary community standards, the dominant theme of the material as a whole appeals to prurient interest." 354 U. S. at 489. This does not mean, as I see it, that the material must appeal to *the* prurient *of* the average person in the context of "being attractive" or "interesting". It would seem that the average person would ordinarily find obscenity repulsive and revolting so that it would not appeal to him in that sense. Rather, "appeal" in the constitutional obscenity context is used in the sense of "an urgent request, entreaty or supplication",[3] as, for example, as used in an "appeal" for funds. The prurient interest requirement under the *Roth* test is met if the average person finds, applying contemporary community standards, that the dominant theme of the material taken as a whole seeks to excite lustful thoughts or lascivious longings and, thus appeals to prurient interest, of all it is likely to reach. And it also may be directed to a clearly defined deviant sexual group rather than the public at large. *Mishkin v. New York, supra,* at 508. The material before us exhorts the commission of unnatural or perverted sexual practices. Its announced theme is an appeal to prurient interest. "Ya gotta tit on it"; "you ought to yank it and crank it"; "you can always flog it, sog it, clog it"; "hey, listen, you can eat it, heat it and beat it."

---

**3.** See The American Heritage Dictionary of the English Language (1969).

And as pointed out the meaning of these terms is graphically illustrated. And then it commands, "Do it—now go to it". It seeks to arouse an obsessive interest in improper matters of sexual nature. It is material having a tendency to excite lascivious and lustful thoughts. "Prurient interest may be excited or appealed to" by it. See *Roth, supra,* note 20, 354 U. S. at 487. It graphically depicts perverted sexual acts involving several participants in scenes of orgy-like character. It is apparent from the mere viewing of it, that it is an appeal, in the sense of a call, an entreaty, a supplication, to prurient interest of all those it is likely to reach.

The material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters. I need no "expert" to lead me to a conclusion that the representation of sexual matters by the material here affronts any and all contemporary community standards. It is clearly beyond customary limits of candor and deviates from society's standards of decency. A community cannot, where liberty of speech and press are concerned, condemn that which it generally tolerates. But here the community condemns what the cartoons depict and advocate. The commission of unnatural or perverted sexual practices is unlawful. Code, Art. 27, § 554. Expert testimony is not required to prove that a community finds unacceptable sexual acts which it declares a crime and prosecutes for their commission.

The material screams that it is utterly without redeeming social value. There is no pretense of artistic value in its presentation. It is not offered as a work of art or a literary endeavor or an educational sex manual. It lacks even the purported criticism of a public official that the drawing, considered with the surrounding text, indicated in *Dillingham v. State, supra.* The majority find that the publication before us "is packed with political comment and with vigorously urged political views." They feel that because the views are unpopular and outrageous they are socially valuable. They quote *Terminiello v. Chicago,* 337

U. S. 1, 4 to the effect that a function of free speech under our system of government is to invite dispute. With this I have no quarrel. But it provides no excuse for the obscenity here. I agree that with the exception of the material on pages 18 and 19, the publication here is not obscene. But to sanctify the cartoon material on the nebulous predicate that it is political criticism, or an expression of "dissent, rebellion, revolution, iconoclasm, hedonism, libertarianism, anti-authoritarianism and anti-establishment protest", so that its dominant character is "polemic rather than prurient", is to dignify it without reason and to read into it what is simply not there. The other parts of the publication, in the circumstances, do not purify the obscene material. I cannot find that this hard-core pornography is so integral a part of the publication as a whole as to preclude appellant's conviction of distributing obscene matter. I see no such reasonable connection between the obscene matter and the theme of the balance of the paper, whatever it may be, sufficient to purge the cartoon material of its obscene character. In other words, hard-core pornography may not be constitutionally distributed merely by making it part of a publication which may be otherwise constitutionally proper. The material here cannot conceivably be characterized as embodying communication of ideas or artistic values inviolate under the 1st Amendment unless we come to the rule that a State is utterly without power to suppress, control or punish the distribution of any matter upon the ground of its "obscenity". This Court has not indicated a disposition to adopt such a rule and only two members of the Supreme Court have consistently adhered to such a rule.[4]

Appellant was convicted at a bench trial in the Circuit Court for Prince George's County on a charge that he "did unlawfully and knowingly sell and have in his possession with intent to sell lewd, obscene and indecent

---

4. See *Ginzburg v. United States*, 383 U. S. 463, 476, 482 (dissenting opinions); *Jacobellis v. Ohio*, 378 U. S. 184, 196 (concurring opinion); *Roth v. United States*, 354 U. S. 476, 508 (dissenting opinion).

newspapers" on 23 June 1969.[5] It is not disputed that evidence which was entered by stipulation was sufficient to show that appellant sold and possessed with intent to sell the newpaper involved, the Washington Free Press, vol. 3, no. 5, June 1 through June 15, 1969. The newspaper was admitted in evidence without objection. Having found the matter to be obscene, the next inquiry is whether it was established that appellant had knowledge of the character and content of the subject matter of the paper. If this knowledge was not proved, appellant did not "knowingly" sell or possess the paper, and scienter, as a necessary element of the offense, would be lacking. The majority reach this point only after determining that the paper was not obscene, and thus need not have reached it at all. But after deciding that the conviction must be reversed because the publication was constitutionally protected by freedom of speech, they declare: "Even were the material before us obscene by any test, however, the conviction of appellant here would have to be reversed because of the utter failure of the State to show any evidence of scienter on his part as required by *Smith v. California*, [361 U. S. 147]." What *Smith v. California* held was that a law which eliminated all mental elements from the crime was unconstitutional, the ordinance in question there opening too far the door barring federal and state intrusion into the area of freedom of speech and press because it made a crime the mere possession in a bookstore of an obscene book with no element of scienter required. Pointing out that the holding in *Roth*, did not

5. It seems from the language used that the count of the indictment charging the offense was drawn under § 418 (a), Art. 27 of the Maryland Code as it existed prior to its repeal by ch. 394, Acts 1967. But the language was sufficient to charge the offense proscribed by the new § 418 enacted in lieu thereof by ch. 394 and applicable to acts occurring on and after 1 June 1967. New § 418 provides *inter alia*: "Every person who knowingly * * * in this State * * * distributes * * * or has in his possession with intent to distribute * * * any obscene matter is guilty of a misdemeanor." By § 417 "matter" includes "newspaper", subsection (1); "distribute" means to transfer possession of, whether with or without consideration, subsection (3); and "knowingly" means having knowledge of the character and content of the subject matter, subsection (4).

recognize any state power to restrict the dissemination of books which are not obscene, the Court thought that such an "ordinance's strict liability feature would tend seriously to have that effect by penalizing booksellers, even though they had not *the slightest notice* of the character of the books they sold." (Emphasis added). At 152. But it said, at 154:

> "We need not and most definitely do not pass today on what sort of mental element is requisite to a constitutionally permissible prosecution of a bookseller for carrying an obscene book in stock; whether honest mistake as to whether its contents in fact constituted obscenity need be an excuse; whether there might be circumstances under which the State constitutionally might require that a bookseller investigate further, or might put on him the burden of explaining why he did not, and what such circumstances might be."

Thus, although *Smith* determined that a defendant criminally charged with purveying obscene material must be shown to have had some kind of knowledge of the character of such material, the quality of that knowledge was not defined. The Supreme Court had the opportunity to define it in *Redrup v. New York,* 386 U. S. 767, for the point was squarely before it in that case and in one of the other two cases therein considered, *Austin v. Kentucky,* but it did not do so, disposing of the cases on the ground that the materials could not constitutionally be adjudged obscene by the States—an issue two of the justices in dissent thought had been deliberately excluded from review. The majority complain that I take too narrow a view of *Smith.* Apparently they want *Smith* construed so as to say what they would like it to say, but the fact remains that it expressly did not define scienter. The majority then turn to *Mishkin v. New York, supra,* decided before *Redrup.* But, as they recognize, the Court in *Mishkin* also stated that its ruling made "it unneces-

sary for us to define today 'what sort of mental element is requisite to a constitutionally permissible prosecution.' " 383 U. S. at 511. However, the *Mishkin* opinion found that the argument that there was insufficient proof of scienter was without merit and listed the facts *in that case* which showed scienter. This by no means precludes other and different facts in other cases being sufficient to prove scienter. In short, proof of scienter is not required to be within the factual posture of *Mishkin.*

The statute here meets the test of *Smith* for it requires that the act proscribed be committed "knowingly". Code, Art. 27, §§ 417 (a) and 418. I do not feel that it is necessary that a person know that material is obscene in law. If he had knowledge of character and content of the subject matter and thought it not constitutionally obscene, he would still be guilty if it were found obscene on judicial investigation. And I do not think that *actual* knowledge of the nature and content is constitutionally required; a person may have *constructive* knowledge. Appellant claimed he did not read the particular issue of the newspaper involved. But he knew the character of the Washington Free Press, so much so in fact that he did not sell it in his Ocean City Shop after discussion with Worcester County authorities. He knew it had run afoul of the law in Montgomery County, and he went so far as to check with the authorities in Prince George's County, but not as to the issue here involved. The Assistant State's Attorney to whom he talked made clear in his testimony on appellant's behalf that what he conveyed to appellant was that one issue might be all right but another obscene. "* * * I did convey to Mr. Woodruff that you must look at each issue individually, but that as a general proposition it would not be the position that the mere existence of this or any newspaper would be a crime. * * * As a policy matter the Washington Free Press would not be considered in and of itself an illegal newspaper, that it would have to be considered on a one by one basis * * *." At another point in his testimony he said, "The question that was asked of me by Mr. Wood-

ruff was would as a general policy there be the same type of situation in Prince George's County as there had been in Montgomery County relating to the Washington Free Press. I told Mr. Woodruff in my opinion there would not, but that it would not be possible to pass judgment in the future as to the legality of something that hadn't yet come out. I think that Mr. Woodruff understood that as far as the one to one idea." The majority recognize that "[p]roof of knowledge on the part of an entrepreneur of the merchandise he carries may be indirect, as well as direct. The knowledge may be general, as well as specific." But they conclude, in the face of the record here, that "there was simply no evidence, direct or indirect, of scienter whatsoever." With what information appellant had about the Washington Free Press and the notice from his discussions with the Assistant State's Attorney for Prince George's County, it was no legal excuse that he had not read this particular issue. I would find in the circumstances that he had constructive knowledge of the nature and content of the specific issue here involved. He cannot claim lack of knowledge by closing his eyes to what was there to see when he had reasonable cause to look. *Greenway v. State,* 8 Md. App. 194, 201-202. See *Carter v. State,* 10 Md. App. 50, 53-56; *Donnenberg, et al. v. State,* 1 Md. App. 591, 604. I think a holding that the knowledge requirement of the statute was met by the evidence adduced would not be constitutionally precluded and would be otherwise proper. I would so hold.

Since by my independent constitutional judgment on the facts there was evidence sufficient in law to prove the *corpus delicti* of the crime charged and the criminal agency of appellant, he stands properly convicted.[6]

---

6. Ordinarily when an action has been tried by the lower court without a jury we may not set aside its judgment on the evidence unless clearly erroneous, giving due regard to the opportunity of the lower court to judge the credibility of the witnesses. Maryland Rule 1086. Both the credibility of the witness and the weight of the evidence are matters for the trier of fact. *Rasnick v. State,* 7 Md. App. 564; *Taylor v. State,* 7 Md. App. 558. We apply these rules in

The case was decided below on the sole issue of hard-core pornography *vel non*.[7] The majority do not share the lower court's view that the material was hard-core pornography but they reach this conclusion almost as an after thought. They first discuss whether the material was obscene under the *Roth* test as if hard-core pornography had not even been an issue below, and complaining that the State had produced no expert testimony, make an independent constitutional judgment that the material was not obscene. "[N]ot only do not all three of the neces-

---

reviewing cases involving convictions for offenses ranging from the felony of murder in the first degree to the misdemeanor of disorderly conduct. But in *Jacobellis, supra,* the Brennan opinion expressly rejected the contention that the determination whether material was obscene "can be treated as a purely factual judgment on which a jury's verdict [or a court's verdict when it is the trier of fact'] is all but conclusive, or that in any event the decision can be left essentially to state or lower federal courts with [the Supreme Court] exercising only a limited review such as that needed to determine whether the ruling below is supported by 'sufficient evidence'. * * * Since it is only 'obscenity' that is excluded from the constitutional protection, the question whether a particular work is obscene necessarily implicates an issue of constitutional law. * * * Our duty admits of no 'substitute for facing up to the tough individual problems of constitutional judgment involved in every obscenity case.'" 378 U. S. at 187-188. The opinion reaffirmed the principle that in obscenity cases the Court had to make an independent constitutional judgment on the facts of the case as to whether the material involved is constitutionally protected. *Id.,* at 190. The Court of Appeals and this Court have assumed this obligation. *Sanza v. Board of Censors,* 245 Md. 319; *Donnenberg v. State, supra.* See concurring opinion in *Dillingham v. State, supra,* 710-714.

7. The State came to trial prepared to prove, first that the material was hard-core pornography and second, were it to fail in that, to establish that the material was obscene under the *Roth-Alberts* test even though not hard-core. The Assistant State's Attorney told the court:

"[I]t is the State's position * * * that the material on those pages [pages 18 and 19 of the newspaper] is hard-core pornography * * * and therefore, requiring * * *, no proof other than the viewing by the court. However, if the court decides that it does not meet the standard of hard-core pornography the State will proceed with witnesses in order to meet the *Roth-Alberts* standards of regular pornography."

The lower court considered the newspaper which was in evidence. No other evidence was adduced by the State in its case in chief. The court found that the material constituted a *prima facie* showing of obscenity. Appellant put on his case. The judge held the material to be hard-core pornography and found appellant guilty.

sary elements coalesce, but none of the three even stands alone." They reverse the judgment. And they provide for a new trial on remand, "[s]ince it is possible that the State may be able to produce expert testimony, as indeed they indicated they would if the judge's finding that the material was hard-core pornography had not foreclosed the effort, to prove the three elements of obscenity under Roth * * *." I find the grant of a new trial incongruous with their opinion and, in any event, they leave the lower court without guidelines for retrial. For example, the majority do not indicate what contemporary community standard they will accept, whether national, state, local or otherwise. So the State does not know what community's contemporary standard it shall attempt to prove and the trial court does not know what community's contemporary standard it may properly find controlling. Nor do the majority suggest what type of evidence could overcome their specific finding that "in looking at the entire newspaper, the redemptive social value speaks for itself." And they expressly hold: "Not even the cartoon taken as a whole, far less the entire newspaper taken as a whole, is wholly devoid of redeeming social value." I am hard pressed to imagine how the "expert testimony" they call for will be able, in the face of such a finding and holding, to change their independent constitutional judgment that the publication has redeeming social value to an independent constitutional judgment that it is utterly without redeeming social value.

Two matters in the majority opinion as it relates to "expert testimony" give me pause. I am in disagreement with the majority as to what qualifies a person as an expert witness with regard to the three elements of the *Roth* test and I think that the established law is not in accord with their view of the function of this Court in passing upon the lower court's determination whether or not a witness is qualified as an expert in the field of obscenity. The majority feel that the refusals to accept the testimony of Mrs. Ann Sweat and James Harold Hamilton were "abuses of the [trial] court's discretion." Ordinarily

whether a witness is qualified to express an opinion on the subject on which he is called to testify is a matter of the trial court to pass upon in the first instance and the court's ruling will not be reversed unless it is shown to have been based upon an error of law or to have been the result of an abuse of judicial discretion. *Yudkin v. State,* 229 Md. 223. But I point out: "In obscenity litigation, however, this court will be required to scrutinize more closely the rulings of the trial judge with respect of the qualifications and competency of witnesses offered as experts. * * * The trial judge must be mindful, therefore, of our obligation to assess his rulings in this regard in light of their objective correctness instead, merely, of determining whether he has, or has not, abused his discretion or that he is in error as to the law." *Hewitt v. Board of Censors, supra,* at 582-583. That persons who qualify as experts under *Hewitt* are hard to come by is shown by the detailed discussion in the *Hewitt* opinion of the witnesses offered as experts who testified in that case. And see *Sanza v. Board of Censors, supra,* in which of the numerous witnesses produced by the Board, the Court of Appeals found only two qualified as experts in their particular field under the *Hewitt* requirements.

In assessing the trial judge on his objective correctness in refusing to permit Mrs. Sweat to testify I am not satisfied that under the *Hewitt* requirements, she was qualified as an expert on redemptive literary value and community standards, and find no error in her rejection by the court. Her educational background and work experience—she had been in library work for 8 years and was the "assistant coordinator of adult services for the Prince George's County Memorial Library", selecting adult materials for the library System [8]—did not in themselves make her an expert in the fields for which she was of-

---

8. She said the "Prince George's County book selections policy was the basic guideline in selecting materials." She "thought" that "it generally states that the library is an information center for the community, that we provide materials on both sides of controversial questions, that we make available material to the public, serve as a communication center for the public."

fered. She said that in making her selections she took into consideration "such things as the current community standards for morality and sexual practices and so forth." But when asked why she thought she had a familiarity with "community standards in the presentation of sexual matters" she said she felt ."it is a part of the total community" and that it was "the responsibility of the librarian to find out what is the nature of the community in which she is employed." Asked how she apprised herself of the contemporary community standards with regard to sexual matters specifically, she replied, "I think, perhaps, it is just more contact with people." This generality did not, in my opinion, sufficiently establish her qualifications.

Hamilton was offered as an expert on "the community standards of literary social values." He was a branch librarian at the Suitland Branch Library of the Prince George's County Memorial Library System. He received a Master's degree in library science in 1968. He had read a newsletter, published by the American Library Association, which "is devoted entirely to intellectual freedom concern across the nation. * * * Censorship, questions of censorship, or perhaps, librarians who have been in difficulty because of something they did select and put in their library. There have been some such cases but not a great many, but some." But when he was asked if he knew "the average community standard with regard to the presentation of sexual matters", he said, "No; I wouldn't want to say that I knew what the average man thought in regard to those matters." He was excused. Defense counsel observed that the witness had been offered "for his criticism of the material, for the social value, specifically on the test dealing with any redeeming social value in the publication." The majority opinion does not state why he was offered but observes that he, as well as Mrs. Sweat, might have thrown some light on contemporary community standards. Hamilton said he could not. I find no error in the court's refusal to permit him to testify as an expert.

I note that neither the trial judge in his consideration of the evidence, nor this Court in its independent appraisal of the facts, is required to accept the opinions and conclusions of the two witnesses who testified as experts on the question of redeeming social value, even if they may be properly considered experts in that field. Nor do I find error requiring reversal in the refusal of the trial court to admit into evidence other publications purchased in Prince George's County. That they were offered for sale in the community did not mute the scream of the hard-core pornography in the publication here at issue. Nor did the mere offering of them for sale, perhaps illegally, absent proof of how many were sold and to whom, tend to establish that the matters they presented, even if shown to be comparable to the material at hand, represented the local contemporary community standard, if that is the standard to be applied, as to sexual matters.

It may well be that "the price of freedom * * * of speech or of the press is that we must put up with, and even pay for, a good deal of rubbish." The material in *Bennett v. State*, 11 Md. App. 248, provides an example. The material here does not. I do not believe that the 1st Amendment requires that the public put up with the fulsome and noisome rubbish before us. It is hard-core pornography and I would affirm the judgment.

Judge Anderson and Judge Powers each authorizes me to state that he joins this dissent.