THE STATE, EX REL. SENSENBRENNER, MAYOR, APPELLEE, *v.* ADULT BOOK STORE ET AL., APPELLANTS.

(No. 9891—Decided March 2, 1971.)

*Mr. John C. Young,* city attorney, *Mr. William J. Melvin* and *Mr. Robert A. Cohen,* for appellee.

*Mr. Laurence E. Sturtz* and *Mr. Walter J. McNamara III,* for appellants Adult Book Store et al.

*Mr. William E. Boyland,* for appellants Mid-America Book Store et al.

WHITESIDE, J. This is an appeal from a judgment of the Franklin County Court of Common Pleas, in an action brought pursuant to R. C. 2905.343,* enjoining the appellants from selling or distributing 127 magazines and books which the trial court found to be obscene.

There has been much litigation in recent years concerned with the limitations upon the general police power of the respective states in the area of the regulation or prohibition of obscenity. Unfortunately, this litigation has not resulted in clearly-defined limitations upon the exercise of the police power regulating obscenity, but, rather, has rendered this area of the law most confusing and uncertain.

The United States Supreme Court has applied the First Amendment protections against the abridgement of freedom of speech or of the press to the states through the Fourteenth Amendment to the United States Constitution, and, a majority of that court has consistently held that obscenity is not within the area of constitutionally protected speech or press. *Roth v. United States* (1957), 354 U. S. 476.

There has been a general assumption that the First

---

*Subsequent to this action in the Common Pleas Court, R. C. 2905.343 was repealed.

Amendment to the United States Constitution is directly applicable to the states. This is obviously not the case. The First Amendment reads in pertinent part that "Congress shall make no law * * * abridging the freedom of speech, or of the press * * *." By its very language, the First Amendment has no further application than to prohibit Congress from making any law which abridges the freedom of speech or of the press. In *Roth,* the issue was stated as follows, at pages 479-80:

"In Alberts, the primary constitutional question is whether the obscenity provisions of the California Penal Code invade the freedoms of speech and press as they may be incorporated in the liberty protected from state action by the Due Process Clause of the Fourteenth Amendment."

Section I of the Fourteenth Amendment of the United States Constitution reads as follows:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The only logical conclusion from a comparison of the First Amendment to the United States Constitution with the Fourteenth Amendment is that Congress may make no laws whatsoever abridging the freedom of speech or press, whereas the states are prohibited from depriving any person of the liberty of speech or press without due process of law.

Far too often this distinction has been forgotten or ignored, and the same limitations placed upon state action under the Fourteenth Amendment as have been placed on federal action under the First Amendment. However, to apply the sweeping prohibition on the First Amendment to the states is to ignore the language of the Fourteenth Amendment, "without due process of law." In other

words, to apply the sweeping prohibition of the First Amendment to the states, the Fourteenth Amendment must be read as merely stating; "nor shall any state deprive any person of the liberty of speech or press." However, the additional language contained in the Fourteenth Amendment, "without due process of law," cannot be ignored or rendered nugatory. In *Duncan* v. *Louisiana* (1968), 391 U. S. 145, the United States Supreme Court apparently recognized this distinction but did not comment further thereon since it was not an issue directly involved. The court stated at pages 147-148:

"The Fourteenth Amendment denies the States the power to 'deprive any person of life, liberty, or property, without due process of law.' In resolving conflicting claims concerning the meaning of this spacious language, the Court has looked increasingly to the Bill of Rights for guidance; many of the rights guaranteed by the first eight Amendments to the Constitution have been held to be protected against state action by the Due Process Clause of the Fourteenth Amendment. That clause now protects * * * the rights of speech, press, and religion covered by the First Amendment * * * ."

There can be little quarrel with this statement that rights (or liberties) of speech, press, and religion covered by the First Amendment are protected against state action by the Fourteenth Amendment. However, in applying this principle, courts must remain mindful that such rights (or liberties) are protected from state action only to the extent that it deprives a person of rights (or liberties) without due process of law.

As noted above, the United States Supreme Court has held that obscenity is not included within the freedom of speech or of the press. In *Roth,* the Supreme Court did have before it the distinction between the First and Fourteenth Amendments, and rejected the argument, apparently because it was not necessary to be decided in view of the holding that obscenity is not expression protected by the First Amendment, and the judgment was that of affirmance. The court stated, in footnote 31 at page 492:

"For the same reason, we reject, in this case, the argument that there is greater latitude for state action under the word 'liberty' under the Fourteenth Amendment than is allowed to Congress by the language of the First Amendment."

Even there, the court did not consider the words "without due process of law."

In any event, it would appear that this issue has not been squarely presented to the United States Supreme Court in any of the subsequent cases, for that court has not directly commented on the fact that there is greater latitude for state action under the Fourteenth Amendment than is allowed to Congress by the First Amendment.

Perhaps, the constitutional principles involved would be clearer, and more easily understood and applied by the courts, lawyers and laymen, if the courts and others would refrain from the illogical fiction of referring to the incorporation of the First Amendment into the Fourteenth Amendment and, instead, express the constitutional principle in its proper perspective that the liberties or freedoms guaranteed by the First Amendment are among the liberties protected by the Fourteenth Amendment. Under such circumstances, courts could clearly proceed to the determination of whether or not state action affecting First Amendment liberties was with or without due process of law, in accordance with the Fourteenth Amendment.

Furthermore, the Ohio Constitution, Section 11, Article I, also guarantees the freedom of speech and of the press and reads in pertinent part as follows:

"Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press."

While the Ohio constitutional provision is probably more closely equated with the limitations of the Fourteenth Amendment than with those of the First Amendment to the United States Constitution, there is no necessity in this case to determine or to rely upon such differences. As noted above, the United States Supreme

Court has clearly held that obscenity is not within the constitutionally protected freedom or liberty of speech or press. In *Stanley* v. *Georgia* (1969), 394 U. S. 557, 22 L. Ed. 2d 542, it is stated in the majority opinion at page 568 that:

"*Roth* and the cases following that decision are not impaired by today's holding. As we have said, the states retain broad power to regulate obscenity * * * ."

It is necessary, therefore, to examine what constitutes obscenity, which is not within the constitutionally protected liberty of speech and press. This task is made more difficult by the fact that there has been no clear standard adopted by a majority of the United States Supreme Court. For several years following *Roth,* the United States Supreme Court cases in this area were almost without exception by a majority of the court agreeing to a judgment predicated on differing reasons and explained in concurring opinions.

In 1967, the United States Supreme Court apparently gave up any efforts to reconcile the varying views of the respective justices into a clear majority rule and resorted to a per curiam handling of obscenity cases, indicating that regardless of which view was to be followed in individual cases the judgments would be the same. The dilemma confronting the United States is probably best expressed in a decision apparently adopting this policy. In *Redrup* v. *New York* (1967), 386 U. S. 767, 87 S. Ct. 1414, the court, at page 770, said:

"Two members of the Court have consistently adhered to the view that a State is utterly without power to suppress, control or punish the distribution of any writings or pictures upon the ground of their 'obscenity.' A third has held to the opinion that a State's power in this area is narrowly limited to a distinct and clearly identifiable class of material. Others have subscribed to a not dissimilar standard, holding that a State may not constitutionally inhibit the distribution of literary material as obscene unless '(a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b)

the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value,' emphasizing that the 'three elements must coalesce,' and that no such material can 'be proscribed unless it is found to be *utterly* without redeeming social value.' *Memoirs* v. *Massachusetts*, 383 U. S. 413, 418-419. Another Justice has not viewed the 'social value' element as an independent factor in the judgment of obscenity. *Id.*, at 460-462 (dissenting opinion).

"Whichever of these constitutional views is brought to bear upon the cases before us, it is clear that the judgments cannot stand."

Subsequent to the *Redrup* case, almost all obscenity cases before the United States Supreme Court have also been decided by *per curiam* decisions citing *Redrup* as the basis for the decision. In most instances, there are two, three or four judges dissenting from the judgment. Today, it would appear that there are at least two and probably three justices of the United States Supreme Court who dissent from the general tenor of the judgments of that court, and who would permit greater latitude in the regulation of obscenity than is permitted by the judgments of that court.

We appear not to have a consentaneous majority view of the United States Supreme Court to follow but, rather, appear to have what might be termed a "deciding-minority view," the application of which is dispositive of most of the cases presented to that court. This, of course, is the view expressed in *Roth, supra,* and elaborated upon in *A Book Named "John Cleland's Memoirs of a Woman of Pleasure"* v. *Attorney General of Massachusetts* (1966), 383 U. S. 413, commonly referred to as *"Memoirs."*

A state court, when confronted with an obscenity question, may be tempted to adopt and apply the minority view which most closely adheres to the view of the state court. However, if a state court is to be realistic and desires to render a judgment which will probably be af-

firmed if appealed to the United States Supreme Court, it must endeavor to render a judgment in accordance with what we have referred to as the deciding-minority view. This we shall attempt to do in this case.

The deciding-minority view of the United States Supreme Court has been expressed most frequently in the opinions of Mr. Justice Brennan. In *Memoirs* (and *Redrup*), the key elements that must coalesce to make material obscene were stated as follows: first, the dominant theme of the material taken as a whole appeals to a prurient interest in sex; second, the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and, third, the material is utterly without redeeming social value. Also to be considered, however, is the test set forth in *Ginzburg* v. *United States* (1966), 383 U. S. 463, and *Mishkin* v. *New York* (1966), 383 U. S. 502. In *Ginzburg,* the majority opinion states, at page 465:

"In the cases in which this Court has decided obscenity questions since *Roth,* it has regarded the materials as sufficient in themselves for the determination of the question. In the present case, however, the prosecution charged the offense in the context of the circumstances of production, sale, and publicity and assumed that, standing alone, the publications themselves might not be obscene. We agree that the question of obscenity may include consideration of the setting in which the publications were presented as an aid to determining the question of obscenity, and assume without deciding that the prosecution could not have succeeded otherwise."

The court further states, at page 467:

"Besides testimony as to the merit of the material, there was abundant evidence to show that each of the accused publications was originated or sold as stock in trade of the sordid business of pandering—'the business of purveying textual or graphic matter openly advertised to appeal to the erotic interest of their customers.' "

The Court further says in this regard, at pages 474 and 475:

"Rather, the fact that each of these publications was created or exploited entirely on the basis of its appeal to prurient interests strengthens the conclusion that the transactions here were sales of illicit merchandise, not sales of constitutionally protected matter.

"It is important to stress that this analysis simply elaborates the test by which the obscenity vel non of the material must be judged. Where an exploitation of interests in titillation by pornography is shown with respect to material lending itself to such exploitation through pervasive treatment or description of sexual matters, such evidence may support the determination that the material is obscene even though in other contexts the material would escape such condemnation."

We view *Ginzburg* and *Mishkin* primarily as limitations upon the application of the redeeming social value test. While material otherwise obscene, as stated in *Memoirs,* may not be proscribed entirely where it has a redeeming social value, when a person is exploiting material for its prurient appeal, such person is not entitled to rely upon the fact that in other contexts the material may have redeeming social value. Thus, the redeeming social value test is applicable only in those situations where the material itself is on trial or is being utilized for its redeeming social value. The opinion in *Memoirs* (383 U. S. 413) placed the issue in its proper perspective, at page 415, when it stated:

"This is an obscenity case in which Memoirs of a Woman of Pleasure (commonly known as Fanny Hill) written by John Cleland in about 1750, was adjudged obscene in a proceeding that put on trial the book itself, and not its publisher or distributor."

In the instant case, both the material and the distributors are "on trial."

State courts have had particular difficulty in attempting to apply the standards as announced in *Redrup.* This is evinced by the fact that there have been numerous reversals of decisions in obscenity cases by short per curiam opinions merely citing *Redrup, e. g: Keney* v. *New*

*York* (1967), 388 U. S. 440; *Friedman* v. *New York* (1967), 388 U. S. 441; *Ratner* v. *California* (1967), 388 U. S. 442; *Cobert* v. *New York* (1967), 388 U. S. 443; *Sheperd* v. *New York* (1967), 388 U. S. 444; *Avansino* v. *New York* (1967), 388 U. S. 446; *Aday* v. *United States* (1967), 388 U. S. 447; *Books, Inc.,* v. *United States* (1967), 388 U. S. 449; *A Quantity of Copies of Books* v. *Kansas* (1967), 388 U. S. 452; *Mazes* v. *Ohio* (1967), 388 U. S. 453; *Schackman* v. *California* (1967), 388 U. S. 454; *Potomac News Co.* v. *United States* (1967), 389 U. S. 47; *Conner* v. *City of Hammond* (1967), 389 U. S. 48; *Central Magazine Sales, Ltd.,* v. *United States* (1967), 389 U. S. 50; *Chance* v. *California* (1967), 389 U. S. 89; *I. M. Amusement Corp.* v. *Ohio* (1968), 389 U. S. 573; *Robert Arthur Management Corp.* v. *Tennessee, ex rel. Canale, District Attorney General* (1968), 389 U. S. 578; *Felton* v. *City of Pensacola* (1968), 390 U. S. 340; *Henry* v. *Louisiana* (1968), 392 U. S. 655; *McMann* v. *Ross* (1969), 396 U. S. 118; *Cain* v. *Kentucky* (1970), 397 U. S. 319; *Bloss* v. *Dykena* (1970), 398 U. S. 278; *Walker* v. *Ohio* (1970), 398 U. S. 434; *Hoyt* v. *Minnesota* (1970), 399 U. S. 524.

Such *per curiam* decisions have, of course, afforded no clarification of the varying standards set forth in *Redrup.* Consequently, we must continue to attempt to follow the deciding-minority view as set forth above.

Three expert witnesses were called in the court below, one by the appellee and two by the appellants. The expressed opinions of the appellee's expert were, of course, in support of the finding of the trial court. While the expressed opinions of appellants' experts were contrary to the findings of the trial court, their testimony supported the findings.

The first expert called by the appellants was Robert Wilburn Canzoneri, a professor of English at Ohio State University. Canzoneri was asked what the dominant theme of relator's Exhibit A-1 was and he stated:

"The dominant theme, as I see it, of this material, has to do with precisely what I was saying a moment ago, about the male, pictures of the nude male that is, there is

an emphasis upon the genitalia area. That is, it seems to be designed to—for use by those who find the male genitals attractive.''

Canzoneri gave his definition of the word "lust" as follows:

"Well, my understanding of the concept of lust is that one is excited to or a rather overpowering urge toward, in terms of sex now, and toward sexual relationships of some sort with another person.''

When asked if realtor's Exhibit A-2 would appeal to a lustful or prurient interest in sex, Canzoneri responded:

"I do not believe that the magazine—if I may answer that question? It might appeal to a lustful interest. I think it would have a secondary appeal to a lustful interest or a prurient interest, but the lustful and prurient interest in their active sense is directed towards another person.

"I do not believe this magazine to be inciteful to prurient interest.''

Canzoneri further clarified his understanding of the meaning of the word "prurient" when with respect to realtor's Exhibits A-7, A-8, F-1, F-2, F-4 in R-26, he was asked whether they appealed to a prurient interest in homosexuals. He stated:

"No, again I take the prurient interest to imply that there is some incitement to the release of sexual urges on some other human being, and, in fact, some other non-consenting non-adult human being, I see no reason to consider that prurient.''

In response to a question as to whether realtor's Exhibit A-12 appeals to a prurient interest in sex, Canzoneri responded as follows:

"A. The opinion is that it does not appeal to the prurient interest, in that it does not seem to me to be designed to arouse anyone to any undue action in regards to sex.

"Q. But it may excite?

"A. It may excite, right. I would make that distinction between exciting and prurient interest because a prurient interest involves undue excitement, which I take it to

mean there is some action reprehensible to society which would involve, in other words, society, rather than private individuals.''

Canzoneri, in his testimony, clearly indicated that he was applying these definitions of prurient interest in expressing his opinions. In other words, Canzoneri's opinions were predicated upon the assumption that the dominant theme of material taken as a whole would not appeal to a prurient interest in sex unless such material would incite the reader to the release of his sexual urges on some other human being, in fact, some other non-consenting non-adult human being.

Stated in other words, Canzoneri's opinions were predicated upon the belief that no material appeals to a prurient interest in sex unless looking at such material results in some sexual action reprehensible to society involving some other person not a consenting adult. We do not understand the standard set forth by the deciding-minority view of the United States Supreme Court to be so limited in scope.

In fact, this general type of argument was rejected in *Roth.* At page 489 of *Roth* (354 U. S. 476), it was stated by the United States Supreme Court that:

''Both trial courts below sufficiently followed the proper standard. Both courts used the proper definition of obscenity.''

At pages 485-486 of *Roth,* what is meant by appealing to prurient interest is set forth as follows:

''It is strenuously urged that these obscenity statutes offend the constitutional guaranties because they punish incitation to impure sexual *thoughts,* not shown to be related to any overt antisocial conduct which is or may be incited in the person stimulated to such *thoughts.* In *Roth,* the trial judge instructed the jury: 'The words ''obscene, lewd and lascivious'' as used in the law, signify that form of immorality which has relation to sexual impurity and has a tendency to excite lustful *thoughts.*' (Emphasis added.) In Alberts, the trial judge applied the test laid down in *People* v. *Wepplo,* 78 Cal. App. 2d Supp. 959, 178 P.

2d 853, namely, whether the material has 'a substantial tendency to deprave or corrupt its readers by inciting lascivious *thoughts* or arousing lustful desires.' (Emphasis added.)''

Furthermore, at pages 486-487 in *Roth,* it was stated:

''It is insisted that the constitutional guaranties are violated because convictions may be had without proof either that obscene material will perceptibly create a clear and present danger of antisocial conduct, or will probably induce its recipients to such conduct. But, in light of our holding that obscenity is not protected speech, the complete answer to this argument is in the holding of this Court, in *Beauharnais* v. *Illinois, supra* [343 U. S.], at page 266:

'' 'Libelous utterances not being within the area of constitutionally protected speech, it is unnecessary, either for us or for the State courts, to consider the issues behind the phrase ''clear and present danger.'' Certainly no one would contend that obscene speech, for example, may be punished only upon a showing of such circumstances. Libel, as we have seen, is in the same class.'

''However, sex and obscenity are not synonymous. Obscene material is material which deals with sex in a manner appealing to prurient interest.''

At this point, the Supreme Court set forth its definition of what is meant by appealing to prurient interest, in a footnote which reads as follows:

''20. *I.e.,* material having a tendency to excite lustful thoughts. Webster's New International Dictionary (Unabridged, 2d ed., 1949) defines *prurient,* in pertinent part, as follows:

'' '* * * Itching; longing; uneasy with desire or longing; of persons, having itching, morbid, or lascivious longings; of desire, curiosity, or propensity, lewd * * *.'

''*Pruriency* is defined, in pertinent part, as follows:

'' '* * * Quality of being prurient; lascivious desire or thought * * *.'

''See also *Mutual Film Corp.* v. *Industrial Comm'n,* 236 U. S. 230, 242 [59 L. Ed. 552, 35 S. Ct. 387, 390],

where this Court said as to motion pictures: '* * * They take their attraction from the general interest, eager and wholesome it may be, in their subjects, but a *prurient interest may be excited and appealed to* * * *.' (Emphasis added.)

"We perceive no significant difference between the meaning of obscenity developed in the case law and the definition of the A.L.I., Model Penal Code, Section 207.10 (2) (Tentative Draft No. 6, 1957), viz.:

" '* * * A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i.e., a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters * * *.' See comment, *id.*, at 10, and the discussion at page 29 *et seq.*"

We understand that material appeals to prurient interest when the material has a dominant tendency to excite lustful thoughts. In other words, we understand that it is *not necessary* that material *excite* lustful *acts* in order to be material appealing to prurient interest, but that a tendency to *excite* lustful *thoughts* (rather than acts) is sufficient. Stated in other words, we understand that the "appeal to a prurient interest in sex" part of the definition of obscenity is met where material appeals to a shameful or morbid interest in nudity or sex (*e. g.* voyeurism).

A review of Canzoneri's testimony indicates that the dominant theme of the material involved taken as a whole does appeal to a prurient interest in sex within the meaning of those words as set forth above. Canzoneri repeatedly testified that the material herein involved would be sexually exciting and is designed to enable a person looking at the material to enjoy a vicarious sexual relationship with the person or persons depicted in the pictures.

An example of the latter type of testimony is as follows:

"* * * That is to say, someone who at least, say, a male homesexual, could take the magazine and look at

these pictures and vicariously enjoy a sexual relationship with that person depicted.

"They seem to me to be designed for those people who do not have the sexual opportunity but have the sexual desire for sexual relations with—in the case that we are talking about—with the male and also who have a curiosity about it."

The testimony of appellants' own witness Canzoneri can lead to but one conclusion, and that conclusion is that the dominant theme of the material herein involved taken as a whole appeals to a prurient interest in sex. The first standard of the definition of obscenity established by the deciding-minority view is, therefore, met by the testimony of appellants' own expert witness.

Appellants' second expert witness was William Simon, a sociologist. With regard to the meaning of the word "prurient," Simon testified as follows:

"Q (By Mr. Sturtz) Doctor, in the field of sociology, is there a commonly-accepted definition of the word 'prurient'?

"A I'm afraid not.

"Q Are there a number of definitions?

"A Yes.

"Q Would you state to the Court the various definitions?

"A The simplest is probably simply lustful, but that frequently becomes circular, evoking lustful feelings. Very commonly the addition of the term 'morbid' or 'unhealthy interest in sex' is included as part of the definition.

"Another aspect of the definition that turns out to be quite common is that it evoked feelings that are powerful, overwhelming, such that the individual has difficulty restraining his own behavior.

"Perhaps another aspect is another implication that is commonly used among professions is that it suggests the evocation of the obsessive.

"The Court: Of the what?

"The Witness: The obsessive, being obsessive with some aspect of the sexual."

Other testimony indicated that Simon's testimony was predicated upon a definition of "prurient" that would involve the evoking of feelings that are powerful, overwhelming, such that the individual has difficulty restraining his own behavior, and possibly including being obsessive with some aspect of the sexual. We also note the following testimony of the witness, Simon.

"Q (By Mr. Cohen) Could you define the term 'pornography'?

"A Yes. Again I am sure you know its initial usage, it refers to the language of and the study of the prostitute.

"In its more contemporary use, it refers to materials that deal in relative degrees of explicitness with sexual behavior, depiction of the sex act, and yes.

"Q Will you define the term 'hard core pornography'?

"A As it is commonly used, it really refers to the degree of explicitness with which such sexual activity is described or represented.

"Q Would you categorize these 18 books as a whole, or individually, as hard core pornography?

"A At best, medium soft.

"Q Please?

"A At best, medium soft. To me personally, in terms of distinctions I make, the line of 'hard', it is sexual activity, that bodies are touching other bodies in sexually purposeful ways with genital exposure and there may be some of that there, as I recall, but exceedingly limited.

"Q I refer you to Relator's Exhibit A-16. Would you define any of this, the pictures depicted here as hard core pornography?

"A No, because there is no genital contact.

"Q How about these pictures, Doctor?

"Mr. Sturtz: What exhibits are you referring to now?

"Q (By Mr. Cohen) I'm sorry, excuse me, Relator's Exhibit A-17. I will try to find the page number which is— I will show you the picture.

"Would you refer to those pictures as hard core pornography?

"A Well, the same grounds, the absence of congenital contact. I think part of the problem for me is that I don't know how much of this you have seen at the Institute. We had access to the Kinsey collection, and when I say "hard core," I have a series of images in my head that really talk about people explicitly doing sexual things to other people with a great deal of manifest genital involvement, and against that background, this really comes under the heading, you know, this would go to the middle area.* * *"

The testimony of appellants' witness Simon, taken as a whole, was to the effect that the material as to which he testified was pornography. However, it is apparent that he would classify only "hard core pornography" as appealing to a prurient interest in sex. The deciding-minority view of the United States Supreme Court has not limited to hard core pornography the type of material that may constitutionally be classified and regulated as being ob· scene.

It would appear to us that "medium core pornography" as well as "hard core pornography" constitutes material the dominant theme of which taken as a whole appeals to a prurient interest in sex. Accordingly, the testimony of appellants' witness Simon also supports the conclusion that the dominant theme of the material herein involved, taken as a whole, appeals to a prurient interest in sex.

Two of the exhibits present a slightly different problem than the others. These are Relator's Exhibits J-7 and R-9. Appellants' witness Canzoneri testified that these two exhibits could be typified as being nudist-colony type magazines. He further testified that the sexual aspect is less dominant in these magazines than in the others. However, he further testified as follows: "It might again, despite the lesser emphasis on sex, it might still be sexually exciting to a degree." This testimony, together with other factors which we shall discuss later, permits a determination that the dominant theme of these magazines, also, taken as a whole, appeals to a prurient interest in sex. In other words, while these exhibits might not constitute ma-

terial appealing to a prurient interest in sex in a different context, they do constitute such material under the context of this case.

Further indication of the nature of the material herein involved is found in the testimony of appellants' witness Canzoneri who stated that the material appeals to voyeurism; that is, an appeal to a person whose sexual desires are concentrated upon seeing the sexual organs of others, or seeing sexual acts. In other words, a peeping tom-type of person. Appellants' witness Canzoneri testified in this regard as follows:

"I don't think it tends to arouse lustful feelings. I think it tends to arouse feelings, yes, but not necessarily toward the other person. There is a great deal of voyeurism obviously on this publication and in all of these publications by their very nature."

"The Witness: I think the purpose seems to be essentially that of many of the magazines that we have talked about. That is to say, that the aim is toward the fulfillment of interest and of people who do not have love partners, someone else with whom they may have sexual relations as the principal design.

"It seems to me it would appeal very strongly to the Peeping Tom aspect or the voyeurism, even to the designed, if you noticed, which are almost like half-closed windows."

It appears to us that where the dominant theme of material taken as a whole appeals to voyeurism, it must be concluded that the dominant theme of the material taken as a whole appeals to a prurient interest in sex. In other words, an appeal to voyeurism is an appeal to a prurient interest in sex.

We now turn to a consideration of the second element that must be present in order to constitutionally prohibit the distribution of literary material as being obscene. This, of course, is that the material must be patently offensive because it affronts contemporary community standards relating to the description or the representation of sexual matters. This element of the test of obscenity has been in-

cluded in the deciding-minority view because of the obvious fact that there can be material the dominant theme of which taken as a whole appeals to a prurient interest in sex, but which is handled in such a way that it does not affront contemporary community standards relating to the description or representation of sexual matters: in other words, the appeal to a prurient interest in sex is described or represented in a manner acceptable to the community.

The testimony of appellants' witness Canzoneri also supplies this element of the test of obscenity. He repeatedly testified that the material herein involved offends contemporary community standards, whether on a local, state or national level, although there are a few localities in which this may not be true. An example of such testimony is as follows:

"Yes, I have an opinion. The opinion is that it is not patently offensive as long as it is not displayed publicly or put in the circumstances where the community cannot avoid it.

"If it were done so, then it would [be] offensive to a large portion of the community."

It is our understanding that the test of whether material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters is to be determined in the first instance from the nature of the material. It is clear that the testimony of appellants' witness Canzoneri was that the material herein involved is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters. His testimony, however, is argumentative in that he contends that a person who never sees the material cannot be offended by it. However, the material herein involved was openly offered for sale to the adult public.

Appellants' witness Simon testified he did not feel the material affronted contemporary community standards because he had seen comparable material openly offered for sale. If we were to follow this reasoning, there could be no prohibition of obscene material as long as the sellers of

the material openly offered it for sale. This, of course, is not the test. Whether or not material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters must be determined as best we can from the attitudes of the national public at large.

Appellants argue, in accordance with the testimony of their witnesses, Canzoneri and Simon, that the community cannot be offended by that which it cannot see. This argument, however, fails to recognize the true nature of this element of the deciding-minority view. It is not the contemporary community that must be affronted by the manner of description or representation of sexual matters. Rather, it is the contemporary community *standards* that must be affronted by the manner of description or representation of sexual matters. Appellants and their witnesses would eliminate the word "standards" entirely from the element that the material is patently offensive because it affronts contemporary community *standards* relating to the description or representation of sexual matters. Matter may affront, or be offensive to, standards of the contemporary community even though only a few persons actually see or have an opportunity to see the material.

There can be no doubt that there are people who desire to make a profit by selling material of the nature herein involved. Likewise, there can be no doubt but that there are people who desire to purchase such material. The group of people desiring this type of material was referred to by appellants' witness Canzoneri as a "subculture." In other words, it is quite obvious that if there were not people desiring to profit from the sale of pornography and people desiring to purchase pornography, there would be no obscenity problem. However, the national community standards with regard to the description or representation of sexual matters cannot be determined by that minority or sub-culture desiring to sell, publish, purchase or observe such material. The only absolutely accurate way of determining national community stand-

ards would be by a plebiscite at which every elector was required to vote. This, of course, is impractical, if not impossible.

Under our system of government we rely upon elected representatives to reflect contemporary community standards in almost every area. Since the institution of this case, the Ohio Legislature enacted R. C. 2905.34, which gives some insight into what it believes constitutes contemporary community standards. This section reads as follows:

"As used in sections 2903.13 to 2903.16, inclusive, and sections 2905.34 to 2905.39, inclusive, of the Revised Code:

"(A) Any material or performance is 'obscene' if, when considered as a whole and judged with reference to ordinary adults, any of the following apply:

"(1) Its dominant appeal is to prurient interest;

"(2) Its dominant tendency is to arouse lust by displaying or depicting nudity, sexual excitement, or sexual conduct in a way which tends to represent human beings as mere objects of sexual appetite;

"(3) Its dominant tendency is to arouse lust by displaying or depicting bestiality or extreme or bizarre violence, cruelty, or brutality;

"(4) It contains a series of displays or descriptions of nudity, sexual excitement, sexual conduct, bestiality, extreme or bizarre violence, cruelty, or brutality, or human bodily functions of elimination, the cumulative effect of which is a dominant tendency to appeal to prurient interest, when the appeal to such interest is primarily for its own sake or for commercial exploitation, rather than for a genuine scientific, educational, sociological, moral, or artistic purpose.

"(B) 'Nudity' means the showing, representation, or depiction of human male or female genitals, pubic area, or buttocks with less than a full, opaque covering, or of any female breast with less than a full, opaque covering or any portion thereof below the top of the nipple, or of covered male genitals in a discernibly turgid state.

"(C) 'Sexual excitement' means the condition of human male or female genitals when in a state of sexual stimulation or arousal.

"(D) 'Sexual conduct' means masturbation, homosexuality, lesbianism, sadism, masochism, natural or unnatural sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person is a female, a breast.

"(E) 'Material' means any book, pamphlet, ballad, printed paper, phonographic record or tape, motion picture film, print, picture, figure, image, description, or other tangible thing capable of being used to arouse interest through sight, sound, or in any other manner.

"(F) 'Performance' means any motion picture, preview, play, show, skit, dance, or other exhibition performed before an audience."

R. C. 2905.34, of course, is not applicable to this case. However, it does give this court some insight as to what the state legislature has determined to be the type of material which is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters.

The testimony of appellants' witness Canzoneri, as well as the material itself, clearly supports the trial judge's conclusion that the material herein involved is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters.

In determining this issue, courts must be careful not to permit a minority of people or the views of a given locality, be they more liberal (or permissive) or more conservative (or restrictive) than the national standard, to impose their will upon the national community at large. What we must be seeking is a general community standard of the nation as a whole, not the standard of the most permissive, with regard to the description or representation of sexual matters, or the standard of those most restrictive with regard to the description or representation of sexual matters.

While it would seem more in keeping with our federal system, to permit the determination of contemporary community standards relating to the description or representation of sexual matters to be determined upon a state-by-state basis rather than a national basis, we are required to apply (in keeping with the deciding-minority view) a national standard rather than a state standard.

There can be no doubt that there are communities, including some very large communities, in this country where apparently the contemporary community standards relating to the description or representation of sexual matters is most permissive and would permit almost any type of description or representation. On the other hand, there are communities whose contemporary community standards will prohibit almost all descriptions or representations of sexual matters. Neither of these constitute a national standard.

Far too often, it would appear to us, a national standard is not utilized but rather the standards of the most liberal or permissive communities are imposed upon the entire nation as a purported national standard.

In regard to standards, it is interesting to note that in *Roth* (354 U. S. 476), in footnote 30, at page 492, it is stated:

"It is argued that because juries may reach different conclusions as to the same material, the statutes must be held to be insufficiently precise to satisfy due process requirements. But, it is common experience that different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system."

Also interesting in this regard is the statement of Mr. Justice Brennan in a dissenting opinion in *Kingsley Books, Inc., v. Brown* (1957), 354 U. S. 436, at page 448, as follows:

"The jury represents a cross-section of the community and has a special aptitude for reflecting the view of the average person. Jury trial of obscenity therefore provides a peculiarly competent application of the stand-

ard for judging obscenity which, by its definition, calls for an appraisal of material according to the average person's application of contemporary community standards."

In other words, the contemporary community standards we are seeking to determine are those of the average person in the national community rather than those of the most sophisticated in sexual matters, or the most liberal or permissive in sexual matters, such as the expert witnesses who testified in this case.

Also, courts must refrain from applying their own personal standards relating to the description or representation of sexual matters. What we are seeking to apply is the contemporary standard of the average person in the nation, including both men and women, with respect to the representation or description of sexual matters. It is most difficult even if possible, to find or identify the hypothetical average person. Each of us like to think that our personal views are reflective of contemporary national community standards relating to the description or representation of sexual matters, as well as in all other areas. However, judges by the very nature of their experience are necessarily exposed to materials which the average person never sees and would avoid seeing if he could do so.

Perhaps the best answer to the determination of what material is obscene lies (as suggested by Mr. Justice Brennan in his opinion in *Roth* and dissenting opinion in *Kingsley*) with a determination by a jury under proper instruction of a court as to the standards to be applied. As Mr. Justice Brennan stated, a jury, representing a cross-section of the community, has a special aptitude for reflecting the view of the average person as to what material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters, and we need not concern ourselves with the possibility that different juries may reach different conclusions as to the same material because this is one of the natural consequences of our jury system.

However, the United States Supreme Court has ap-

parently not seen fit to adopt the view expressed by Mr. Justice Brennan which would limit the reversal of jury determinations to those situations where the evidence was such that reasonable men could only conclude that the material involved was not obscene, but has apparently made its own independent determination irrespective of a jury determination and irrespective of whether or not reasonable men might differ as to whether or not the material involved is obscene.

As stated above, in making a determination as to whether material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters, courts must be careful not to impose as a national standard either the views or attitudes of the most permissive localities or segments of our society, nor those of the most restrictive localities or segments of our society. The material involved herein might not affront the contemporary community standards of the most permissive segments of society or localities of our country but most assuredly would affront the contemporary community standards of the most restrictive segments of society and localities of our country.

Based upon a review of the material itself and upon the testimony of appellants' own witnesses, we conclude that a determination that the material in this case is patently offensive because it affronts national contemporary community standards relating to the description or representation of sexual matters is not only reasonable, justified, and supported by the evidence, but is required by the evidence if we are to apply national contemporary community standards rather than the standards of the most permissive segments of society or those of the most permissive localities within our nation.

Again, relator's exhibits J-7 and R-9 pose a slightly different problem. These are the magazines referred to as being nudist-colony type magazines. However, appellants' witness Canzoneri testified in this regard as follows:

"My opinion is that these would offend a large por-

tion of the community if they were enforced upon it in some way or made unavoidable, given an appearance unavoidably in the community but to the extent that they are excluded from the community at large and allowed to be seen only by those perhaps with specific interest in them, I can see no way in which there can be patent offense to the community.''

This testimony requires a determination that these exhibits also constitute material which is patently offensive because they affront contemporary community standards relating to the description or representation of sexual matters under the context of this case.

The third element required by the deciding-minority view (although not accepted by one of the justices who concurs in the other two elements) is that the material must be utterly without redeeming social value before it may be classified as obscene.

Each of appellants' witnesses testified that he found social value in this material. However, the social value that was found by these witnesses was predicated upon the appeal of the material to a prurient interest in sex. Stated in other words, the appellants' experts testified that the material has social value because it is pornography, that is, because it does appeal to a prurient interest in sex.

Appellants' witness Canzoneri predicated his opinion of social value upon his conclusions that the material would afford an opportunity for a person to have vicarious sex experiences or satisfaction, would satisfy curiosity concerning the sexual organs of others, and would enable persons to compare their own sexual organs with those of others. Simon's testimony (appellants' witness) was of a similar nature.

We do not understand the deciding-minority view to be referring to this type of ''social value'' with respect to a determination of whether material is utterly without redeeming social value. Under the theory advanced by appellants through witnesses Canzoneri and Simon, all pornography, including hard core pornography would have redeeming social value, because it is pornography. We view

the required test to be that the material must have social value for some purpose other than its use as pornography. "Social value" *because* the material is pornography does not meet the test; rather, "social value" *despite* the fact that the material has all the attributes of pornography is the required test.

Basically, the appellants' contention is that obscene material has redeeming social value because it fulfills the desires of persons desiring to look at obscenity who otherwise might seek other outlets for this desire. Such contention is inconsistent with the statement of the Supreme Court in *Roth* at page 484 which was as follows:

"But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance. This rejection for that reason is mirrored in the universal judgment that obscenity should be restrained, reflected in the international agreement of over 50 nations, in the obscenity laws of all of the 48 States, and in the 20 obscenity laws enacted by the Congress from 1842 to 1956. This is the same judgment expressed by this Court in *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 571-572, 86 L. Ed. 1031 [62 S. Ct. 766, 769]:

" ' * * * There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. *These include the lewd and obscene * * *. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality * * *.*' (Emphasis added.)"

Also, this entire line of reasoning put forth by appellants was expressly rejected in *Roth*, as set forth above.

There was no evidence which would justify a finding that the material in question in the context of this case has redeeming social value for any purpose other than its use as obscenity.

There is yet another reason why we must conclude

that the material herein involved is utterly without redeeming social value. This material was sold as the stock in trade of the "sordid business of pandering"; that is, the business of purveying pictorial or graphic material openly advertised to appeal to the erotic interest of customers. This is the test of the *Ginzburg* case, *supra* (383 U. S. 463). It is true that there was no blatant advertising of the material. We conclude, however, that pandering includes the business of purveying pictorial or graphic matter by an appeal to the erotic interest of customers by subtle and sophisticated advertising as well as by blatant and explicit advertising.

It was stipulated that the windows of the bookstores herein involved had blackened windows and large signs stating: "You must be 21 years of age to enter." As stated by counsel for appellants in his oral argument, everyone knows the type of material that is sold in adult bookstores. There can be no doubt that the appellants utilized this type of open, but subtle and sophisicated, advertising to appeal to the erotic interest of their customers in order to sell the material herein involved. In other words, the evidence indicates that this material was exploited by appellants entirely on the basis of its appeal to prurient interest.

The Ohio Legislature has supplied us insight into a legislative determination of what constitutes redeeming social value by the enactment (subsequent to the institution of this case) of R. C 2905.38(C), which reads as follows:

"It is a defense to a charge brought under Section 2905.35 of the Revised Code, that the obscene material was disseminated or the obscene performance was presented for a bona fide medical, scientific, educational, religious, governmental, judicial, or other proper purpose, by or to a physician, psychologist, sociologist, scientist, teacher, person pursuing bona fide studies or research, librarian, clergyman, prosecutor, judge, or other person having a proper interest in such material or performance."

While there was testimony that a very small portion of the material herein involved might meet the standard

of redeeming social value under a different context than that involved here, the evidence is clear that the material was exploited by appellants entirely on the basis of its appeal to prurient interest and was in no way sold or made available for any use which might constitute redeeming social value. Accordingly, under the context of this case, none of the material herein involved has any redeeming social value.

Essentially, appellants' argument is that since they do not force anyone to purchase the type of material in this case, but, rather, sell the material only to those who wish to purchase it for its appeal to prurient interest in sex, the material should not be considered obscene. If this reasoning were adopted, there would be no material, including the worst of the hard core pornography, the sale of which could constitutionally be prohibited so long as the material was sold only to those who wished to purchase it because it was obscene.

Appellants, in effect, contend that the only constitutional limitation upon the sale of obscene material is that set forth in *Redrup, supra* (386 U. S. 767) at page 769 as follows:

"* * * In none was there any suggestion of an assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it."

We do not understand this to be the only permissible limitation for if it were, the three standards set forth by the deciding-minority view would have no application whatsoever, but, rather, the only determination would be whether or not some individual's privacy was invaded by forcing the material upon him. Rather, the invasion of privacy permits the prohibition of material which would not be considered obscene under the deciding-minority view tests of obscenity.

There is another aspect with regard to this type of material that makes it a matter of legislative concern, similar to the aspect commented upon in *Mishkin, supra* (383 U. S. 502) with regard to printed material. There is inher-

ent in the publication of such material exploitation of the persons posing for the pictures including, in some instances, minors.

It is highly improbable that some of the material herein involved could be prepared without acts of prostitution or sodomy. Inherent in the publication of pictorial pornography is the commission of acts, directly or indirectly, which are abhorrent to our national society, and are prohibited by the laws of almost all jurisdictions. This constitutes yet an additional reason why pictorial obscenity is not within the constitutional protections of freedom of speech or the press. However, we do not predicate any portion of our decision upon this aspect, or basis. Rather, this decision is predicated entirely upon a determination that, with respect to the material herein involved, the three elements set forth by the deciding-minority view of the United States Supreme Court are present and they coalesce.

In fact, the material involved here is all obscene, under the context of this case, by whatever definition of obscenity is used, with the possible exception of the standard of one of the justices of the United States Supreme Court who feels that only ''hard core pornography'' can be considered obscene within constitutional limitations. A portion of the material herein involved would even meet the test of ''hard core pornography.''

Appellants further contend that since an individual may have a right to possess obscene material in the privacy of his own home (*Stanley* v. *Georgia* (1969), 394 U. S. 557, 22 L. Ed. 2d 542), the appellants have the right to sell the material herein involved in order to make it available to those individuals who desire to possess obscenity in the privacy of their homes. In *Stanley,* however, the United States Supreme Court expressly stated that *Roth* and the cases following are not impaired by the decision in *Stanley.*

Furthermore, such argument ignores *Ginzburg, supra.* In effect, the appellants' argument is that obscene materials may be sold so long as there is pandering: that is, so long as there is an advertised appeal to the erotic interest

214

of the potential customer. We reject this argument of appellants because it is inconsistent with *Roth, Ginzburg,* and *Stanley.*

In summary, based upon a review of the material itself and the evidence (especially the testimony of appellants' own expert witnesses by which the appellants are bound), we determine that the three elements of obscenity as set forth by the deciding-minority view coalesce with regard to the material herein involved under the context of this case.

We find that the dominant theme of each piece of material herein involved, taken as a whole, appeals to a prurient interest in sex. The appeal to voyeurism is possibly the strongest appeal of all of this material and is its dominant theme. In other words, the dominant theme of this material is an appeal to the peeping-tom type of person who desires to look at this type of pictorial representation in order to enjoy becoming sexually excited and to enjoy the creation, by the material, of lustful thoughts and feelings, and, perhaps, vicarious sexual gratification. While some of the material may appeal to the heterosexual, and some may be designed to appeal to sadomasochists or fetishists or homosexuals, the dominant theme under the context of this case of each of the exhibits herein involved taken as a whole, is an appeal to a prurient interest in sex.

The material herein involved is patently offensive because it affronts national contemporary community standards relating to the description or representation of sexual matters. This is clearly established by the testimony of appellants' own witnesses by which the appellants are bound.

The material herein involved is utterly without redeeming social value. Appellants' witnesses testified that the social value of the material resulted from its use as obscenity. We do not understand this to constitute redeeming social value. Furthermore, the evidence further indicates that the appellants are engaged in pandering; that is the exploitation of the material for its appeal to a prurient interest in sex.

Since all three elements of the deciding-minority view are present and coalesce with regard to the material herein involved, we conclude that such material is obscene within the meaning of the statutory law and constitutes obscenity of a type not within the ambit of constitutionally protected freedom of speech or press.

For the foregoing reasons, the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

Troop, P. J., and Strausbaugh, J., concur.