# Richmond

BOBBY A. PRICE v. COMMONWEALTH OF VIRGINIA.

June 12, 1972.

Record No. 7880.

Present, Snead, C.J., I'Anson, Carrico, Harrison, Cochran and Harman, JJ.

*John W. Carter; Michael K. Curtis* [*N.C.*] (*Norman B. Smith; Carter & Wilson; Smith & Patterson* [*N.C.*], on brief), for plaintiff in error.

*Robert E. Shepherd, Jr., Assistant Attorney General* (*Andrew P. Miller, Attorney General,* on brief), for defendant in error.

Cochran, J., delivered the opinion of the court.

Bobby A. Price, manager of the North Theatre in Danville, was indicted for exhibiting an obscene motion picture, "Anomalies", in violation of Va. Code Ann. § 18.1-230 (Cum. Supp. 1971)[1]. He was tried by a jury which found him guilty and fixed his punishment at confinement in jail for 12 months and payment of a fine of $1000. We granted Price a writ of error to the judgment entered on the verdict.

In late December and early January, 1971, the film was shown in Danville. It was advertised as X-rated (restricted to adult audiences), and a security guard was employed by the management to prevent unmarried persons under 21 years of age from entering the theatre.

After Price had been indicted, a consent order was entered enjoining the public exhibition of the film. Thereafter, the Commonwealth arranged for a number of local citizens, including members of

---

[1] "§ 18.1-230. Obscene exhibitions and performances.—Every person who knowingly:

"(1) Produces, promotes, prepares, presents, manages, directs, carries on or participates in, any obscene exhibitions or performances, including the exhibition or performance of any obscene motion picture, play, drama, show, entertainment, exposition, tableau or scene; provided, that no employee of any person or legal entity operating a theatre, garden, building, structure, room or place which presents such obscene exhibition or performance shall be subject to prosecution under this section if the employee is not the manager of the theatre or an officer of such entity, and has no financial interest in such theatre other than receiving salary and wages; or

"(2) Owns, leases or manages any theatre, garden, building, structure, room or place and leases, lets, lends or permits such theatre, garden, building, structure, room or place to be used for the purpose of presenting such obscene exhibition or performance or who fails to post prominently therein the name and address of a person resident in the locality who is the manager of such theatre, garden, building, structure, room or place shall be guilty of a misdemeanor."

the Mayor's Committee for Decent Literature, to view "Anomalies" at a private showing. Sixteen of these persons testified as witnesses for the Commonwealth at Price's trial.

■ If "Anomalies" is obscene it is not protected by the First Amendment to the Constitution of the United States, made applicable to the states by the Fourteenth Amendment. *Roth* v. *United States*, 354 U.S. 476, 485 (1957). As more recent decisions of the Supreme Court have reflected divergent opinions which failed to gain majority approval we have felt constrained to follow the definition of obscenity set forth in *Roth*, 354 U.S. at 489, "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." *Roth* has been reaffirmed in *United States* v. *Reidel*, 402 U.S. 351 (1971). We have also acquiesced in the following amplification of the *Roth* definition set forth in a plurality opinion in *A Book Named "John Cleland's Memoirs of a Woman of Pleasure"* v. *Massachusetts*, 383 U.S. 413, 418 (1966):

> ". . . [T]hree elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value."

*House* v. *Commonwealth*, 210 Va. 121, 125, 169 S.E.2d 572, 575 (1969). *See Hearn* v. *Short*, 327 F. Supp. 33, 36 (S.D. Tex. 1971) (concurring opinion of Bue, J.).

■ Price's assignment of error to the lower court's ruling that the contemporary standard in issue was that of the local community rather than that of the national or statewide community has been resolved against him by *Alexander* v. *Commonwealth*, 212 Va. 554, 186 S.E.2d 43 (1972). There, noting that the Supreme Court had not been able to agree on a definition of the community by whose standards obscenity should be measured, we approved the local community standard.

Price has assigned error to the action of the lower court in permitting witnesses for the Commonwealth to express their personal opinions about "Anomalies" in testifying as to local community standards. He contends that in the absence of expert testimony on the subject his motion to strike the Commonwealth's evidence was

improperly overruled. We do not agree. Although many of the witnesses did state their personal opinions, which were not evidence of community standards, they also testified that they were familiar with the contemporary community standards in the locality and that "Anomalies" was an affront to these standards and had no social value. Price's reliance on *House* v. *Commonwealth, supra,* as requiring expert testimony, is misplaced. Evidence of contemporary community standards is required. *Id.* at 126, 169 S.E.2d at 576-77. Hence, expert testimony, if available, is admissible, but *House* does not require that experts be produced by the Commonwealth in order to obtain a conviction under the obscenity statute. Witnesses, whose familiarity with contemporary local community standards has been established, are qualified to testify as to such standards.

The sixteen witnesses testifying for the Commonwealth represented a limited cross-section of the Danville community. They came from different backgrounds and were citizens who had lived in Danville an average of 29 years each. To the extent that none represented morally depraved or disreputable elements of society, they did not comprise a true cross-section. They were representative of educational, religious, business, recreational and civic interests in the community. While not experts in the usual sense they were sufficiently expert to testify to the community standards in Danville. *See Gent* v. *State,* 239 Ark. 474, 393 S.W.2d 219 (1965), *rev'd per curiam sub nom Redrup* v. *New York,* 386 U.S. 767 (1967) (hereinafter the citation of cases reversed on the inconclusive authority of *Redrup* will be followed by *(Redrup)*); *State* v. *Henry,* 250 La. 682, 198 So.2d 889, *rev'd per curiam* 392 U.S. 655 (1967) *(Redrup)*; *State* v. *Childs,* 252 Or. 91, 447 P.2d 304 (1968), *cert. denied,* 394 U.S. 931 (1969); *Robert Arthur Management Corp.* v. *State,* 220 Tenn. 101, 414 S.W.2d 638, *rev'd per curiam,* 389 U.S. 578 (1967) *(Redrup)*. Moreover, by stipulation it was agreed that there were five other Commonwealth witnesses summoned, whose occupations were not listed, who, if they had been called, would have given testimony similar to that of the sixteen who testified. So we are satisfied that no reversible error was committed in permitting some of the witnesses for the Commonwealth to give their personal opinions about "Anomalies" as well as their opinions that it violated the community standards with which they were conversant. It follows that the court properly overruled Price's motion to strike the Commonwealth's evidence as to standards.

■ Price contends that the lower court improperly excluded the testimony of his witness, David Flick, Director of the Danville Public Library. Flick was permitted to testify extensively, over objection, concerning the current popularity of certain books, *e.g.*, *Portnoy's Complaint*, dealing with deviant sexual behavior, as indicative of an evolving standard of acceptance of sex in literature. According to Flick, the reading habits of library users in Danville had steadily changed in recent years to reflect an increasing interest in sex. This testimony was clearly relevant to a determination of contemporary community standards. *See Woodruff* v. *State*, 11 Md. App. 202, 273 A.2d 436 (1971).

Flick was not permitted to testify concerning the well attended motion picture "Fanny Hill", which he had viewed in a local theatre, the court ruling, out of the presence of the jury, that evidence as to that film was irrelevant to a consideration of "Anomalies". At the same time the court incorrectly ruled in retrospect, also out of the presence of the jury, that the testimony which Flick had given concerning the books was irrelevant and inadmissible. But this testimony about the change in reading habits of library users was never stricken nor did the court direct the jury to disregard it. So the ruling of inadmissibility was ineffectual and any error with respect thereto was harmless. Furthermore, as there was no proffer of the testimony to be given by Flick concerning "Fanny Hill", we cannot say that the lower court erred in refusing to admit such testimony, particularly in view of Flick's admission that he had not seen "Anomalies".

Price's assignments of error relating to the court's refusal to sustain his motions to strike the Commonwealth's evidence are based upon his contention that "Anomalies" is not obscene as a matter of law.

The Commonwealth witnesses described the film as having no plot or theme and as encouraging sexual deviation rather than normal sexual activities. They testified that "Anomalies" depicted with implicit approval various kinds of perverted and depraved sexual conduct which violated contemporary community standards and had no social value[2]. At least two witnesses testified that the film

---

[2] For example, E. Linwood Wright, a research chemist, termed the movie "a series of several sexual demonstrations of various sexual activities . . . masturbation, voyeurism, lesbianism, homosexuality, exhibitionism, troixism, things which I consider aberrations."

appealed to the viewers' prurient interest. Before the Commonwealth's evidence was completed the jury was given a private showing of the motion picture.

Dr. Myron B. Liptzin, a psychiatrist at the University of North Carolina, was the only defense witness who had seen "Anomalies". He testified that the film had social value because it was entertaining and educational in that it would satisfy the curiosity of the audience. Dr. Liptzin admitted that "Anomalies" would cause sexual arousal in some persons and that a "peeping tom", viewing the film, would either masturbate during the exhibition or after the performance was over.

The jury, which heard all the evidence and also viewed "Anomalies", found Dr. Liptzin's testimony unpersuasive.

■ Having approved a local community standard for determining obscenity, it follows that we would prefer to apply a "sufficiency of the evidence" scope of review to obscenity cases, as suggested by Chief Justice Warren's dissenting opinion in *Jacobellis* v. *Ohio*, 378 U.S. 184 (1964). The evidence here was plainly sufficient to create a jury issue. However, while the Supreme Court has not definitively established the appropriate scope of review in obscenity cases, it appears that all First Amendment questions of "constitutional fact" will receive *de novo* review by that court. *Rosenbloom* v. *Metromedia*, 403 U.S. 29, 54 (1971). Moreover, the prevailing view appears to be that in obscenity cases the courts must make an independent determination of the constitutional issue of obscenity, which is a mixed question of law and fact. *See, e.g., NGC Theatre Corp.* v. *Mummert*, 107 Ariz. 484, 489 P.2d 823 (1971); *Village Books* v. *State's Attorney Prince George's County*, 263 Md. 76, 282 A.2d 126 (1971); *State* v. *Hartstein*, 469 S.W.2d 329 (Mo.), *rev'd per curiam*, 92 S.Ct. 531 (1971) (*Redrup*); *State ex rel. Sensenbrenner* v. *Adult Book Store*, 26 Ohio App.2d 183, 271 N.E.2d 13 (1971); *Scuncio* v. *Columbus Theatre, Inc.*, 277 A.2d 924 (R.I. 1971); *State* v. *Burgin*, 255 S.C. 237, 178 S.E.2d 325 (1970), *rev'd per curiam*, 404 U.S. 806 (1971) (*Redrup*). *But see, e.g., State* v. *McCluney*, 11 N.C. App. 11, 180 S.E.2d 419 (1971); *Moore* v. *State*, 470 S.W.2d 391 (Tex. Civ. App. 1971); *Court* v. *State*, 51 Wis.2d 683, 188 N.W.2d 475 (1971). Accordingly, we have viewed "Anomalies".

The film purports to show that many abnormal sexual activities, which were formerly engaged in furtively, are now more widely practiced by persons who are no longer restrained by any sexual

"hangups" or feelings of guilt. The activities are then explicitly demonstrated in a series of unrelated scenes in which the advantages ascribed to the deviant practices by devotees are mentioned. Except for occasional repetitive words uttered by the narrator, the sound track is limited to background music and assorted moans, groans and grunts supposedly emanating from the performers.

The testimony of Commonwealth witnesses accurately described "Anomalies" and we need not elaborate further. Under the *Roth-Memoirs* test we find that the film is obscene. Its dominant theme or purpose, taken as a whole, appeals to a prurient interest, that is a shameful or morbid interest, in sex. It is patently offensive because it affronts contemporary community standards relating to the description of sexual matters, whether the applicable community standards are local, statewide or national. The film is utterly without redeeming social value. If satisfying the salacious curiosity of the audience gives redeeming social value to "Anomalies", as Dr. Liptzin suggested in his testimony, then there can be no conviction under the obscenity statute for exhibiting any motion picture. No doubt the film has entertainment value for sexual deviants and for other persons who may enjoy viewing simulated acts of sexual perversion. In our view this dubious distinction falls short of furnishing the redeeming social value contemplated by *Memoirs*. *See State ex rel. Sensenbrenner* v. *Adult Book Store, supra* at 210, 271 N.E.2d at 29.

Price has assigned error to the action of the lower court in overruling his motion to quash the indictment[3]. The motion to quash was based on the grounds that the indictment did not allege that the film was "utterly without redeeming social value" and that it used the term "substantially beyond customary limits of candor" rather than "patently beyond customary limits of candor". But, as the Attorney General points out, the indictment was couched substantially in the language of the statute, there was no question that Price was advised of the charges which he was required to defend himself against, and the court's instructions cured any defect in the indictment of which Price complained. Price's attack on the indictment

---

[3] The indictment charged that Price "did, as manager of the North Theatre, permit such theatre to exhibit the motion picture "Anomalies", which said picture, when considered as a whole has as its dominant theme or purpose an appeal to prurient interest, that is a shameful or morbid interest in nudity, sex or excretion, and which go substantially beyond customary limits of candor in description or representation of such matters, in violation of Section 18.1-230 of the Code of Virginia, 1950, as amended, against the peace and dignity of the Commonwealth."

after trial for failure to incorporate the word "knowingly" came too late. *McDougal* v. *Commonwealth*, 212 Va. 547, 186 S.E.2d 18 (1972).

■ Price has assigned error to the refusal by the lower court to grant an instruction which in effect would have told the jury that the film could be found not obscene if adequate precautions were taken to prevent juveniles and unconsenting adults from viewing it and if no "pandering" or offensive advertising material was used to promote the film. This instruction was properly refused as it was not a part of the *Roth-Memoirs* test for obscenity heretofore approved in *House* v. *Commonwealth, supra*.

■ Price contends that Instructions Nos. 1[4] and 2[5] were improperly given by the lower court. His objection to Instruction No. 1 when given was that it did not require any criminal intent, which he has since construed to mean knowledge or scienter. Assuming, without deciding, that in the context of the statute under review the terms are interchangeable, this objection was well taken. Since § 18.1-230 applies only to persons who "knowingly" violate its provisions, knowledge was an essential element of the crime with which Price was charged and should have been included in Instruction No. 1. However, we believe that the lower court's failure to include the element of knowledge was harmless error beyond a reasonable doubt. All that was required was to show that Price exhibited the film knowing its content. Price was the manager of the North Theatre where "Anomalies" was shown for a period of several weeks. He hired a

---

[4] "INSTRUCTION NO. 1

"THE COURT INSTRUCTS THE JURY that if you believe from the evidence beyond a reasonable doubt that the defendant, Bobby A. Price, was the manager of the North Theatre, when the motion picture "Anomalies" was exhibited, and if you further believe from the evidence that the Commonwealth has proved beyond a reasonable doubt the necessary elements as to what determines obscenity as set forth by another instruction of the Court, then you shall find the defendant guilty as charged in the indictment and fix his punishment at confinement in jail for not more than 12 months or by a fine not to exceed $1,000.00, or by both such fine and imprisonment."

[5] "INSTRUCTION NO. 2

"THE COURT INSTRUCTS THE JURY that the test to determine obscenity is as follows: whether to the average person, applying contemporary community standards:

"(1) The dominant theme of the material taken as a whole appeals to a prurient interest, that is a shameful or morbid interest in nudity and sex;

"(2) The material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and

"(3) The material is utterly without redeeming social value."

security guard to prevent unmarried persons under 21 from entering the theatre. The movie was advertised as X-rated and potentially offensive to some people. The evidence of scienter, although wholly circumstantial, was overwhelming. *See State* v. *Vollmar*, 389 S.W.2d 20, 29 (Mo. 1965).

Instruction No. 2, which conforms with a similar instruction approved in *House* v. *Commonwealth, supra,* is a correct statement of law.

■ Price's last assignment of error is directed to the refusal by the lower court to grant a mistrial for allegedly improper argument by the Commonwealth's Attorney. It is apparent that one of Price's counsel as well as the Commonwealth's Attorney went outside the record in closing arguments. Each made statements, completely unsupported by evidence, which were irrelevant and improper. But objection was made by Price to only one of the Commonwealth's Attorney's remarks. Price made no further objections, asked for no cautionary instructions, and did not move for a mistrial until the jury had retired. Under these circumstances, his motion was not timely and was properly refused. *Russo* v. *Commonwealth*, 207 Va. 251, 148 S.E.2d 820 (1966), *cert. denied*, 386 U.S. 909 (1967).

For the reasons stated herein the judgment is

*Affirmed.*